**Michael MILLS and Charlotte S. Mills, Respondents,**

v.

**CAMERON MUTUAL INSURANCE COMPANY, Appellant.**

No. 13431.

Missouri Court of Appeals,
Southern District,
Division Three.

July 12, 1984.

James E. Spain, Hyde, Purcell, Wilhoit, Spain, Edmundson & Merrell, Poplar Bluff for appellant.

Dennis P. Wilson, Parsons & Wilson, P.C., Dexter for respondents.

CROW, Presiding Judge.

Michael Mills and Charlotte S. Mills ("plaintiffs") sought recovery under an insurance policy issued by Cameron Mutual Insurance Company ("defendant") for damage to milo stored on one of plaintiffs' farms. In a two-count petition, plaintiffs prayed that the policy be reformed (Count I), and that they be awarded $20,000 damages (Count II).

Count I was tried without a jury, the court entering judgment reforming the policy as prayed. Defendant's appeal from that judgment was ordered dismissed as premature because Count II remained untried. *Mills v. Cameron Mutual Insurance Co.*, 650 S.W.2d 716 (Mo.App.1983).

Thereafter, Count II was tried without a jury. Plaintiffs were awarded damages of $11,577.02 and interest of $3,994.09.

Defendant appeals anew, insisting that the trial court erred in ordering reformation, inasmuch as plaintiffs' evidence failed to show that the parties intended the milo to be covered by the policy. According to defendant, plaintiffs failed to establish by clear and convincing evidence that the policy, as written, resulted from mutual mistake. Defendant does not dispute the amount of plaintiffs' damage, or the award of interest, if reformation is upheld.

In determining the sufficiency of the evidence, we are mindful that in a court-tried case the trial judge determines

the credibility of the witnesses, and may accept or reject all, part or none of the testimony. *Cusumano v. Outdoors Today, Inc.,* 608 S.W.2d 136, 139[4] (Mo.App. 1980). We are obliged to accept as true the evidence and permissible inferences which may be drawn favorable to the prevailing party, and to disregard the contradictory testimony. *Id.* at 139[5].

Examined in this light, the evidence reveals that in the summer of 1977, plaintiff Michael Mills ("Mike") talked with Tom Houchins, defendant's agent in Bernie, Missouri, about obtaining insurance on a granary and several items of farm equipment. An application dated August 29, 1977, signed by Mike and Houchins, was sent by Houchins to defendant's home office, and a policy was issued to plaintiffs for the coverages requested. The inception date was September 2, 1977, and the term was one year.

At that time, plaintiffs had no grain in storage. Consequently, no coverage for grain was requested in the application, and none was provided in the policy.

That autumn, Mike harvested a crop of milo on plaintiffs' farm, storing it in a "bin" there. Afterward, he obtained a loan on the milo from the Commodity Credit Corporation through the Stoddard County office of the Agricultural Stabilization and Conservation Service. Ed Pulliam, the "head official" of the A.S.C.S. office, told plaintiffs that they should take out insurance on the grain for their own protection.

After receiving this advice, Mike went to see Houchins. Mike testified, "I told Tom that I had been to Bloomfield and taken a loan out on the grain and that Ed had advised us to insure the grain ourselves, and I told him what I had, and he wrote a policy on it."

Later in his testimony, Mike was questioned by the trial court about the conversation with Houchins:

"Q. As best you can remember, what were the words you used when you talked to the agent regarding covering that grain?

A. I told Mr. Houchins that Mr. Pulliam had suggested that we get insurance to cover the grain, and so that was the reason why I was there, to insure the grain.

Q. Did you say anything else?

A. Well, I told him it was under the government loan program, and that was all."

Houchins sent a memorandum, dated October 20, 1977, to defendant's home office. The memorandum stated: "Please add $10,000 of Milo in storage in Metal grain bins—11 23N 9E." [1]

Defendant issued an endorsement to be attached to plaintiffs' policy. The endorsement, for which defendant charged an additional premium, amended the policy effective October 20, 1977, by adding coverage for "10,000 milo in grain bins." Mike received the endorsement some time after it was issued.

In August, 1978, plaintiffs purchased a farm near Dexter, on which a dwelling house was situated. Mike went to see Houchins to obtain insurance on it. Mike testified he told Houchins, "That everything was the same, just include the house and the farm on the policy." Plaintiffs still had the grain "under government loan" at that time, but Mike did not discuss that with Houchins.

An application dated August 14, 1978, signed by Mike and Houchins, was filled out and sent by Houchins to defendant's home office. Items listed on the application under "COVERAGE D—FARM PERSONAL PROPERTY—SCHEDULED COVERAGE" included the following: '

---

**1.** "11 23N 9E" apparently identifies the section, township and range where plaintiffs' farm was situated.

"PROPERTY LIMIT OF LIABILITY

Grain (Specify) milo $10,000"

Defendant issued a new policy ("the 1978 policy") replacing the earlier policy. The 1978 policy had an inception date of August 14, 1978, and was for a period of one year. Among the endorsements attached to, and made part of, the 1978 policy was one captioned: "SECTION 1—COVERAGE D—SCHEDULED FARM PERSONAL PROPERTY." It provided, in pertinent part:

| "Item No. | Limit of Liability | Premium | Schedule |
|---|---|---|---|
| 1. | $10,000 | 47.00 | on Grain Milo |
| 2. | $_____ | _____ | on Grain under Government Loan (Type) _____ located in _____" |

In September or October, 1978, anticipating the harvest of another milo crop, Mike bought two additional grain bins. After harvest, he put the milo in those bins and obtained a loan on it from the Commodity Credit Corporation. Thereafter, Mike went to see Houchins, telling him to write a policy covering this grain just as he had the other grain. On cross-examination, Mike admitted he did not tell Houchins that the newly harvested milo was "in a government loan." Later, however, upon questioning by the trial court, Mike testified:

"Q. But you did say in '78, 'I want to add the milo I have harvested to the policy just the same as the other milo covered', is that correct?

A. Yes, sir.

Q. Now, would you give me as near as you can recall the exact words you used?

A. In '78?

Q. Yes, sir.

A. I just told Tom I had been up to the A.S.C.S. and had them measured, and I wanted coverage to protect the grain that I had, I wanted them written the same way as we had written the policy in 1977.

. . . . .

Q. And when you talked to the agent for the insurance company, do I understand you to say that you told him a representative from the A.S.C.S. had been out and measured the grain?

A. Yes, sir."

Defendant, acting on a memorandum from Houchins' office, issued an endorsement to the 1978 policy, effective October 31, 1978, providing, in pertinent part: "Increase: $30,000 coverage on Grain—Milo or to a new total of $40,000." An additional premium was charged by defendant, and paid by plaintiffs.

On or about May 26, 1979, the milo was damaged by one of the perils insured against. Defendant refused to indemnify plaintiffs for the loss, asserting that the 1978 policy (including the endorsement of October 31, 1978) did not insure "grain under government loan." This suit followed.

Defendant, in explanation of its denial of plaintiffs' claim, presented the testimony of one of its underwriters, Paul William Watson. According to Watson, when defendant's home office received the various documents sent by Houchins regarding plaintiffs' insurance during 1977 and 1978, they were routed to him for examination. Watson, relying on the information in those documents, approved the policies and endorsements issued by defendant. Watson testified that nothing Houchins sent re-

vealed that plaintiffs' milo was subject to a government loan. Watson added that defendant, as a matter of underwriting policy, had never accepted coverage on grain in a federal government loan program during his seven years in defendant's employ.

However, in response to a question by the trial court, Watson conceded that so far as he knew, Houchins, prior to the loss of plaintiffs' milo, had never been notified that he should not accept applications for insurance on grain under a government loan.

Houchins confirmed this, admitting that when he accepted plaintiffs' applications for insurance in 1977 and 1978, he was under the impression that defendant would insure grain under a government loan. Houchins testified he had never been told otherwise by any representative of defendant.

The trial court, in adjudicating Count I, decreed that the 1978 policy be reformed as follows:

" 'Coverage D—Scheduled Farm Personal Property' is reformed to show coverage under Item No. 2 for $40,000 on Grain under government loan, milo, located in Stoddard County, Missouri; rather than showing coverage under Item No. 1 of said Coverage D."

As noted at the outset, it is that segment of the judgment about which defendant complains on this appeal.

 The trial court made no findings of fact or conclusions of law, none being requested. In such circumstances, all fact issues are considered as having been found in accordance with the result reached. Rule 73.01(a)(2), Missouri Rules of Civil Procedure (14th ed.1983); *Hazlett v. Clark,* 652 S.W.2d 135, 136[3] (Mo.App.1983). The scope of our review is established by *Murphy v. Carron,* 536 S.W.2d 30, 32[1] (Mo. banc 1976). The judgment of the trial court will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law.

The rules governing reformation of written contracts are well settled and readily stated, if not always easily applied.

 When by mutual mistake a contract or other instrument is not expressed in such terms as have the force and effect that the parties intended, then it is the clear duty of the court to correct the mistake. *Leimkuehler v. Shoemaker,* 329 S.W.2d 726, 730 (Mo.1959); *Walters v. Tucker,* 308 S.W.2d 673, 675 (Mo.1957). However, a mistake affording ground for the relief of reformation must be mutual and common to both parties to the instrument; it must appear that both have done what neither intended. *Leimkuehler,* 329 S.W.2d at 730; *Walters,* 308 S.W.2d at 675. A mutual mistake in a written instrument presupposes a prior or preceding agreement between the parties, and to show mutual mistake in the instrument, the preceding agreement must necessarily be shown. *Edwards v. Zahner,* 395 S.W.2d 185, 190[6] (Mo.1965). However, it is not necessary to show that the parties agreed on any particular language to be used in the instrument; it is sufficient to show they agreed to accomplish a particular goal and the instrument as executed is insufficient to effectuate their intentions. *Sperrer v. Sperrer,* 573 S.W.2d 693, 695 (Mo. App.1978); *Bollinger v. Sigman,* 520 S.W.2d 710, 712[3] (Mo.App.1975). In order for reformation to be decreed, the evidence of mistake must be clear, cogent and convincing and upon testimony entirely exact and satisfactory. *Urban Expansion, Inc. v. Fireman's Fund Insurance Co.,* 592 S.W.2d 239, 242 (Mo.App.1979); *Grossman Wrecking Co. v. Bituminous Casualty Corp.,* 518 S.W.2d 719, 725 (Mo.App. 1974).

Guided by these principles, we turn our attention to the evidence. In our opinion, the evidence is sufficient to support findings that (1) plaintiffs placed all of the milo they harvested in 1977 and 1978 in storage on their property, (2) they put their entire 1977 milo crop in a government loan program, and did the same with their entire 1978 milo crop, and (3) at the time of the

loss in 1979, plaintiffs owned no milo except what they had harvested in 1977 and 1978.

Additionally, Houchins testified that when Mike applied to increase the coverage from $10,000 to $40,000 following the 1978 harvest, he (Houchins) went to plaintiffs' farm and photographed the bins where the milo was stored.

It is therefore indisputable that the milo damaged in 1979 was the milo that plaintiffs and Houchins meant to insure under the 1978 policy and the endorsement of October 31, 1978. Defendant does not contend otherwise.

The evidence is likewise sufficient to support a finding that when Houchins sent his memorandum of October 20, 1977, to defendant's home office to obtain coverage for plaintiffs' 1977 milo harvest, Houchins knew plaintiffs had placed that crop in a government loan program. We observed *supra* that Mike testified that when he applied to Houchins for the coverage, he (Mike) told Houchins that Pulliam had suggested to plaintiffs that they get insurance to cover the milo, and that "it was under the government loan program." The evidence is also sufficient to support a finding that when Mike applied to Houchins to increase the coverage from $10,000 to $40,-000, necessitated by the 1978 milo harvest, Houchins was aware that plaintiffs had also put that crop in a government loan program. Mike testified he told Houchins that he (Mike) "had been up to the A.S.C.S. and had them measured, and I wanted coverage to protect the grain that I had, I wanted them written the same way as we had written the policy in 1977." This testimony, coupled with what Mike had told Houchins about the 1977 crop, supports a finding that Houchins knew, in October, 1978, that all of the milo plaintiffs had in storage was subject to government loans. We reject defendant's argument to the contrary.

We next take note that there was nothing in the endorsement issued by defendant in October, 1977, that would have alerted plaintiffs that milo under a government loan was not covered. The same is true of the endorsement issued in October, 1978. The only thing plaintiffs ever received from defendant arguably indicating that grain under a government loan was not covered was an endorsement attached to the 1978 policy at the time that policy was issued. That endorsement—the one reformed by the trial court—showed coverage under Item No. 1, Coverage D, Section 1, of $10,-000 for milo. It showed no coverage under Item No. 2 on "Grain under Government Loan." That endorsement, however, was but one of twelve attached to the 1978 policy, and the entry regarding the milo was one of eight under Coverage D, a printed form with blanks to list coverage on 38 separate items. Defendant does not argue that plaintiffs should have realized from that endorsement that their milo was not insured.

It is also noteworthy that Houchins, with commendable candor, admitted he believed in 1977 and 1978 that defendant insured grain under government loan. Defendant makes no contention that plaintiffs or Houchins knew, or should have known, that the government loans had any significance regarding the insurability of plaintiffs' milo.

■ We thus conclude that the evidence is sufficient to support a finding that plaintiffs and Houchins intended plaintiffs' milo to be covered by the 1978 policy and the endorsement of October 31, 1978, and that neither plaintiffs nor Houchins suspected that the 1978 policy, as written, did not cover the milo plaintiffs had in storage at the time of the loss.

Defendant does not deny Houchins' authority to bind defendant to insurance contracts. Watson was questioned on cross-examination about the 1978 policy:

"Q. In other words, Mr. Houchins is the one who put this insurance into effect through a binder on the 14th of August?

A. Yes.

Q. Is that generally the way it's done in your company, your agent writes it, it

comes to your office, and then you send out a policy with the effective date being the date the application was initially taken?

A. Generally."

It is thus evident that Houchins had *actual* authority to bind defendant to insurance contracts.

■ In addition, the evidence supports a finding that Houchins had *apparent* authority to bind defendant to the 1978 policy and the endorsement of October 31, 1978. Mike applied to Houchins for the 1978 policy on August 14, 1978, and that policy, when subsequently issued by defendant, bore an effective date of August 14, 1978. Regarding the endorsement of October 31, 1978, Watson testified that the agent's memorandum submitted by Houchins was dated October 31, 1978, but was not received at defendant's home office until November 2, 1978. The endorsement, however, was issued with an effective date of October 31, 1978.

Plaintiffs could therefore reasonably assume that Houchins was authorized to bind defendant to contracts of insurance, and that his acceptance of their applications for insurance on their milo signified that coverage was in force.

■ An insurer is bound by the acts and contracts of its agent as are within the apparent scope of authority with which he has been clothed, that is, the authority which although not actually granted, the insurer knowingly permits the agent to exercise. *Travelers Indemnity Co. v. Beaty,* 523 S.W.2d 534, 538[10] (Mo.App.1975).

In sum, the trial court could properly find that Houchins had actual authority to bind defendant to insurance contracts, and apparent authority to bind defendant to the 1978 policy and the endorsement of October 31, 1978. If defendant is to escape liability, it can only be because of Watson's testimony that defendant, as a matter of underwriting policy, did not insure grain under government loan, and that when he approved the 1978 policy and the endorsement of October 31, 1978, he was unaware

that plaintiffs' milo was subject to the government loans.

■ In our view, Watson's absence of knowledge about the government loans is of no avail to defendant. Houchins' awareness of the loans is imputed to defendant. *American Family Mutual Insurance Co. v. Bach,* 471 S.W.2d 474, 479[7] (Mo.1971). Moreover, absent fraud on the part of the insured and the agent, an insurance company is bound by all acts, contracts, or representations of its agent, whether general or special, which are within the scope of his real or apparent authority, notwithstanding they are in violation of private instructions or limitations on his authority, of which the person dealing with him, acting in good faith, has neither actual nor constructive knowledge. *Baker v. St. Paul Fire & Marine Insurance Co.,* 427 S.W.2d 281, 285–86[2] (Mo.App.1968). And, even if the agent's actual authority is less than his apparent authority, where the limitations thereon are unknown to the other contracting party, apparent authority is equal to real authority. *Id.* at 286[3]. Consequently, even if Houchins had been privately instructed by defendant not to accept applications for insurance on grain under a government loan, defendant would nonetheless be liable to plaintiffs in the circumstances here.

■ The 1978 policy, as written, did not provide coverage for plaintiffs' milo, inasmuch as the policy provided no coverage for grain under government loan. The 1978 policy, therefore, did not have the force and effect that plaintiffs and defendant, acting through Houchins, intended, and it was the duty of the trial court to reform the policy so that it would cover the milo that the parties meant to insure. The evidence is clear, cogent and convincing, and entirely exact and satisfactory to support the result below.

Judgment affirmed.

GREENE, C.J., and HOGAN, MAUS and PREWITT, JJ., concur.