**Mark E. O'BAR, Appellant,**

v.

**Wanda NICKELS, Respondent.**

**No. 13858.**

Missouri Court of Appeals,
Southern District,
Division Two.

Oct. 15, 1985.

Charles M. Wesley, Waynesville, for appellant.

Tyce S. Smith, Sr., Waynesville, for respondent.

CROW, Judge.

On February 16, 1984, Mark E. O'Bar, Sr. ("plaintiff"), pro se, filed a small claim petition, § 482.340.1, Laws 1982, p. 660, against Wanda Nickels ("defendant") as-

serting he had a claim against her in the amount of $1,000. The petition alleged that the claim arose on or about February 4, 1984, as a result of the following events:

"No heat in my Apt. that I rent for 300.00 a month with utilitys [sic] paid. As long as I pay my rent. I should have comfortable place to live my son with [sic] is 4 months old got sick I called Mrs Nickles [sic] and told here [sic] berns [sic] she wouldn't do anything about the problem I was sending the bill to her".

On March 9, 1984, an associate circuit judge, sitting as "small claims court," § 482.300.2, RSMo 1978, heard the cause without a jury, § 482.310(6), RSMo 1978. Plaintiff and defendant appeared without counsel, evidence was presented, and the court found the issues for defendant and against plaintiff. The court ordered the lawsuit dismissed at plaintiff's cost.

Plaintiff filed a timely application for trial de novo, § 512.190.1, RSMo 1978, and on May 30, 1984, the cause was heard anew by a different associate circuit judge. At that hearing, plaintiff appeared in person and with counsel. Defendant appeared without counsel. Evidently neither party desired a jury, see § 512.310, RSMo 1978, as the cause was heard by the judge alone. Fifteen witnesses, including the parties, members of their families, police officers, a weatherman, and others testified.

On June 21, 1984, the judge entered a decree in favor of defendant and against plaintiff, assessing costs against plaintiff. Plaintiff appeals.

Testimony in the 386-page transcript reveals that plaintiff and his wife, Mary, signed a "monthly rental agreement" on November 4, 1983, under which they became tenants of an apartment in Waynesville owned by defendant. The rent, $300 per month, was to be paid one month in advance. Utilities were to be furnished by defendant. Plaintiff paid the first month's rent, together with a "cleaning deposit" of $100.

Thereafter, a series of incidents occurred, some of doubtful relevance to the issues before us. The trial court, with commendable forbearance, allowed the parties and their witnesses to recount the saga in exhaustive detail. Our summary of the evidence lists the noteworthy occurrences in chronological order, as best we can ascertain the sequence from the record.

The events that precipitated the suit began on Saturday, February 4, 1984. At that time, plaintiff's rent was current, having been prepaid for the rental period ending March 4, 1984. According to plaintiff, the apartment became "very cold" on February 4 and his younger son, Frank, "was taking cold." Plaintiff telephoned defendant "right after midnight," about 12:30 a.m., February 5, asking her to turn on the heat. Defendant explained that the heat was already on, but that she would "come down and check it."

Defendant testified she went to the apartment building and observed that "the furnace was burning and the blower was running." She explained that the furnace that heats plaintiff's apartment is a "forced air automatic gas furnace" and that it also heats three other apartments. The furnace is "automatically controlled by a single thermostat located in the utility room." The tenants of the respective apartments control the flow of heat by "keeping their vents opened and closed as they desire."

Defendant added that she checked the furnace again at 10:00 a.m., February 5, and that at noon she checked it once more, this time accompanied by an employee, Steve Wilkinson. Defendant testified that the furnace was working properly each time.

Wilkinson confirmed that he checked the furnace at defendant's request on February 5 and that it was operating properly. In Wilkinson's words: "[I]t cycled a couple of times so I went out and told [defendant], you know, it looked like it was doing the proper job to me. And I told her I'd keep an eye on it for a couple of days. I went back twice that day and then, you know, a couple times a day for the next three days and it looked like it was working. And every time that I went in there, I would

stand and watch it until it would come on and the blower would cycle."

Plaintiff, however, testified that the apartment remained cold and that he attempted to contact defendant from 8:00 a.m., February 5, until 1:30 p.m., that date, when he reached her by phone. Plaintiff recalled: "I said, 'Ms. Nickels ...' I said, 'We still don't have no heat here.' I said, 'I'd like it turned on, please.' I said, 'Frankie's coughing and sneezing now.' I said, 'It's—he's getting sick.' And so Ms. Nickels said, 'Well ...' She said, 'I just left from there ten minutes ago ...' And she said, '... it was on.'"

According to plaintiff, he repeated to defendant that he had no heat. Then, said plaintiff, defendant "hung up on me."

Plaintiff related that he telephoned defendant the next day (Monday, February 6), informing her that Frank was sick, that he (plaintiff) had to take Frank to the doctor, and that he (plaintiff) was going to send the bill to defendant. Plaintiff quoted defendant as saying: "Don't you do that. I'll have the sheriff down there to move you out of my apartment. You get right out."

Plaintiff testified he said he would be glad to move if defendant would return his $300. Plaintiff quoted defendant as saying: "I'm not going to do it. In the contract it says, no refunds."

Defendant acknowledged that plaintiff demanded that she pay the doctor bill. According to defendant, she explained to plaintiff that she was not responsible for it. Defendant denied telling plaintiff that she "was going to get the sheriff."

Plaintiff testified that it was still cold in the apartment on February 7. This was corroborated by his wife, Mary, who went to police headquarters that date and asked whether anything could be done to compel defendant to fix the heat. A police officer went to the apartment that date and thereafter filed a report noting that "it was indeed very cold in the apartment."

During the next few days, plaintiff and Mary telephoned the offices of several public officials including the Waynesville city administrator, a member of the General Assembly of Missouri, a member of the United States House of Representatives, the Attorney General of Missouri, the Lieutenant Governor of Missouri, and the Vice President of the United States. The calls apparently failed to generate any governmental action against defendant.

Defendant's adult son, Darrell Gene Nickels, testified that he talked to plaintiff around Monday, February 13. According to Darrell: "I told him that it would be wise for him to find another place, that we wouldn't take another month's rent, for him to clean it up and get it in rentable condition and we would refund his deposit." Darrell added: "I told him that it didn't seem that we could get along and he had until the next month's rent was up to find another place to live."

On February 16, as mentioned earlier, plaintiff filed the small claim petition.

Plaintiff testified that on March 1 (while the suit was awaiting its first trial), he offered to pay the rent for the ensuing month but that Darrell Nickels refused to accept it. Darrell, according to plaintiff, told plaintiff it would be better if plaintiff and Mary "just went ahead and moved because of all the problems that we had." Mary O'Bar corroborated plaintiff's testimony, stating that she and he wanted to pay the rent, but that the Nickelses would not take it.

Plaintiff and Mary, together with their two young sons, remained in the apartment, however, and about March 6, 1984 (two days into the next rent period, for which no rent had been paid), Darrell Nickels went to the apartment and talked to Mary O'Bar's mother, Sarah Gideon, who was there as a baby-sitter for the two O'Bar children. Darrell testified he told Mrs. Gideon that it was time for plaintiff "to move out." Darrell asked Mrs. Gideon to relay that message to plaintiff.

Mrs. Gideon testified that Darrell said: "I'm going to throw you out of here. Tomorrow is Wednesday. We're throwing you out of here in the morning."

Plaintiff testified that when Mrs. Gideon told him about the confrontation with Darrell Nickels, he (plaintiff) called Captain Edward Conley of the Waynesville police department and stated he wanted Darrell arrested "for threatening my mother-in-law."

Conley came to plaintiff's apartment and talked to plaintiff and Mary. As Conley was departing, he saw Darrell Nickels and approached him, followed by plaintiff. Plaintiff, Conley, and Darrell gave different accounts of what occurred next.

Plaintiff testified: "... Mr. Conley was talking to Darrell and Darrell looked down there at Mr. Conley and said something about me, and he said, 'And I'm not talking to Mark O'Bar.' He said, 'I want you to tell him that for me.' And so I—right away I went over there and I said, 'Darrell, but I'm talking to you.' I said, 'Don't you ever threaten my mother-in-law again.' And Darrell slapped my hand down. My finger was about from here to that—this part right here. My finger was from right here to Darrell and he slapped my hand, and at that time I said, 'Mr. Conley, I want this man arrested for assault.' And Mr. Conley said, 'I didn't see no assault.'"

Plaintiff explained that he was then instructed by Conley to go back inside the apartment, and that he complied.

Conley testified: "I walked up to talk to [Darrell] and Mr. O'Bar followed me. I asked Mr. O'Bar to step back, you know, to get back out of my way and let me handle it. He refused to do so. He got up and was having a conversation in a loud voice with Mr. Nickels, and he lunged forward toward Mr. Nickels. Mr. Nickels slapped his hand away. Mr. O'Bar finally backed off and went to his apartment and I had a conversation with Mr. Nickels about what was going on in the apartment. Well, you know, whether they were going to evict him or just what the problem was."

Asked whether anything was said about the heat in the apartment, Conley replied that he recalled nothing on that occasion. According to Conley, the apartment was comfortable.

Darrell Nickels described the incident thusly: "... Mr. Conley came out and Mr. O'Bar followed him out, made a threatening move towards my face. I had no idea what he had in his hands or anything. When he moved towards my face, I defended myself and slapped his hand away from my face. I didn't know if he had a knife, a gun, whatever he had; and nobody can make a move towards my face that I won't react naturally and try to protect my eyes and my face, my person."

Plaintiff found a "trailer" to rent on March 7, rented a "U-haul" the following day, moved his family into the trailer, and surrendered the apartment key about March 9. That date, it will be recalled, was the date the first trial occurred.

According to defendant, the day after plaintiff vacated the apartment she found "fried chicken bones in the corners," saw "coke stains," and observed that "the oven was cooked over." Defendant added, "There was a deer head in the freezer and it was just generally stinky."

Defendant's description of the condition of the apartment was fully corroborated by Darrell Nickels and, to a lesser degree, by Darrell's wife, Adele.

Plaintiff testified that he and Mary "left everything clean except the floor."

During plaintiff's 4-month occupancy of the apartment, there were other confrontations and disputes, some resulting in contacts with the police. We need not extend this opinion by synopsizing each such incident, as the acrimony between the disputants and the character of the testimony which the trial court had to weigh and evaluate is amply demonstrated by the evidence already mentioned.

Plaintiff's sole assignment of error, verbatim, is:

"The trial court erred in awarding judgment for defendant for the reason that defendant, nor any of defendant's witnesses, were in the plaintiff's apartment so as to determine whether plaintiff's apartment was getting sufficient

heat; the evidence proved a constructive eviction on part of the defendant landlord and termination of the tenancy without proper notice."

Plaintiff, citing *Antoine v. McCaffery*, 335 S.W.2d 474 (Mo.App.1960), and *Hussey v. Robison*, 285 S.W.2d 603 (Mo.1955), exhorts us to weigh the evidence and reach our own conclusions as to which testimony is deserving of belief. We cannot accept that invitation, inasmuch as the scope of our review in this court-tried case is firmly established by *Murphy v. Carron*, 536 S.W.2d 30, 32[1] (Mo. banc 1976). The judgment of the trial court will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law.

■ Neither party requested that the trial court render an opinion containing a statement of the grounds for its decision, nor did either party specify any controverted fact issues for the trial court to determine. *See:* Rule 73.01(a)(2), Missouri Rules of Civil Procedure (15th ed. 1984). The trial court made no findings of fact or conclusions of law. Consequently, all facts are presumed found in accordance with the judgment, and the judgment is to be upheld under any reasonable theory supported by the evidence. *Elliott v. West*, 665 S.W.2d 683, 689–90[4] (Mo.App.1984); *Lohrmann v. Carter*, 657 S.W.2d 372, 376[1] (Mo.App. 1983).

We recognize, of course, that there was substantial evidence to support a finding that plaintiff's apartment, during at least some of the time that he and his family resided there, was not warm enough for their comfort. Plaintiff, Mary O'Bar, Sarah Gideon, the police officer who was in the apartment February 7, and other persons who were there during plaintiff's occupancy testified that the apartment was cold.

Defendant, however, had evidence to the contrary. We have previously noted the testimony of defendant and Steve Wilkinson that the furnace was operating properly at the time of plaintiff's complaints in early February, and we have also noted the testimony of Captain Conley that the apartment was comfortable when he was there in early March.

In addition, defendant testified that after plaintiff moved out, she went in the apartment and it was warmer than her house. She noticed a plastic cover on the cold air return, which prevented the furnace from circulating air properly. Defendant also testified that during the time plaintiff was complaining about the absence of heat, men were working in two empty apartments heated by the same furnace as plaintiff's apartment. The workmen, according to defendant, "would pull their shirts off."

Darrell Nickels recalled that on one occasion, he and another man were painting an apartment heated by the same furnace as plaintiff's apartment. Darrell and his companion had the door open and their shirts unbuttoned because they were sweating. At that time, according to Darrell, plaintiff came in and complained that his apartment was cold.

Adele Nickels testified that on one occasion when plaintiff complained about lack of heat, she went to the apartment building and saw that the furnace was working properly. Upon leaving, she passed plaintiff's apartment and saw him "sitting there in a light shirt" on a piece of furniture that covered one of the heat vents. Adele testified she saw Mary O'Bar "lying on the floor in front of the French doors watching television or sleeping."

In addition to the above evidence, plaintiff and Mary, by their own admissions, attempted to pay the rent for March, 1984, at a time when this suit was awaiting its first trial. The incongruity of suing one's landlord for failure to provide heat and contemporaneously endeavoring to remain in the apartment by offering the next month's rent was obviously not lost on the trial court.

The thrust of the first segment of plaintiff's assignment of error, as we comprehend it, is that the trial court, on the evidence before it, was compelled to find that

plaintiff's apartment was without sufficient heat during the period that plaintiff was complaining, and that there was no substantial evidence to support any other finding.

We disagree. The trial court was not obliged to believe the testimony of plaintiff or his witnesses. In a court-tried case, the trial judge determines the credibility of the witnesses, and may accept or reject all, part or none of the testimony. *Mills v. Cameron Mutual Insurance Co.*, 674 S.W.2d 244, 246–47[1] (Mo.App.1984); *Cusumano v. Outdoors Today, Inc.*, 608 S.W.2d 136, 139[4] (Mo.App.1980). We are obliged to accept as true the evidence and permissible inferences which may be drawn favorable to the prevailing party and to disregard the contradictory testimony. *Mills*, 674 S.W.2d at 246–47[2]; *Cusumano*, 608 S.W.2d at 139[5].

■ Examined in that light, the testimony of defendant and her witnesses, coupled with plaintiff's attempt to pay the March rent and remain in the apartment, is more than sufficient to support a finding that defendant did not materially breach her obligation to provide sufficient heat to maintain a reasonable level of comfort in plaintiff's apartment during his 4 months of occupancy. That being so, the trial court could have also properly found that whatever illnesses plaintiff's sons contracted while residing in the apartment did not result from insufficient heat. Indeed, plaintiff's "medical" evidence regarding the illnesses consisted only of bills and handwritten reports. The copies of the reports furnished us are, in large measure, illegible, and we are unable to find anything in them attributing any illness to inadequate residential heat. Consequently, we cannot hold that the trial court was obliged to find that plaintiff incurred any medical expenses for his sons because of lack of heat in the apartment.

The thrust of the second segment of plaintiff's assignment of error, as we comprehend it, is that the evidence compelled a finding that plaintiff was either constructively evicted from the apartment or that

his tenancy was terminated without proper notice.

*Wood v. Gabler*, 229 Mo.App. 1188, 70 S.W.2d 110, 113[1] (1934), explains that any wrongful act or any neglect or default on the part of the landlord whereby the premises are rendered unsafe, unfit, or unsuitable for occupancy and a tenant is thereby deprived of the beneficial enjoyment of the premises, amounts to a constructive eviction if the tenant abandons the premises within a reasonable time.

■ Applying this rule to the instant case, we fail to see how the evidence compelled a finding that plaintiff was constructively evicted. First, as noted earlier, the trial court was not constrained to find that plaintiff's apartment was without sufficient heat during the period about which he complains. Second, the evidence did not compel a finding that plaintiff abandoned the apartment because of the lack of heat. By his own admission, and that of his wife, plaintiff sought to remain in the apartment by attempting to pay the rent for March, 1984. Even after his effort was rebuffed, he remained there until his mother-in-law was told by Darrell Nickels that it was time for him to move. Only then did plaintiff vacate the apartment. This evidence is more than sufficient to support a finding that plaintiff departed because he was ordered to, not because of despair over inadequate heat.

Regarding plaintiff's contention that his tenancy was terminated without proper notice, we infer he is referring to defendant's failure to give him one month's notice in writing of her intent to terminate his tenancy. *See:* § 441.060, RSMo 1978.

■ We fail to see how the absence of such notice compelled a judgment for plaintiff in the circumstances here. Assuming, without deciding, that defendant could not have obtained plaintiff's eviction through the judicial process absent proper notice, the point became moot when plaintiff moved out instead of staying put. Moreover, except for plaintiff's moving expense

($32.55 rental for the "U-haul"[1] and $5 for gasoline for it[2]), there was no evidence that plaintiff sustained any damage by reason of moving. He found new living quarters immediately, and it is inferable from the record that the new quarters were more satisfactory to him than the apartment. The record is barren of any evidence regarding the amount of rent plaintiff pays for the new quarters; consequently, there is no showing that the move was financially detrimental. The trial court could have found that plaintiff's moving expenses were offset by the rent-free days that he remained in the apartment before departing.

Having carefully studied the record, we find nothing in plaintiff's assignment of error or his argument thereunder entitling him to a reversal of the judgment.

One other item requires attention. Defendant, citing Rule 84.19, Missouri Rules of Civil Procedure (16th ed. 1985), has moved this Court to award her damages on the ground that plaintiff's appeal is frivolous. Defendant maintains the appeal "is devoid of legal merit," and that its "only possible purpose" is "to harass and inconvenience" her. The motion was ordered taken with the case.

■ *Breshears v. Malan Oil Co.*, 671 S.W.2d 402, 404[3] (Mo.App.1984), states that damages for frivolous appeals are awarded with the greatest caution; the court must not chill appeals of even slight or colorable merit. The presence even of some slight merit bespeaks good faith on the part of the appellant. *Id. Chapman v. Dunnegan*, 665 S.W.2d 643, 650[14] (Mo. App.1984), defines a frivolous appeal as one which presents no justiciable question and is so readily recognizable as devoid of merit on the face of the record that there is little prospect of success. Awarding damages for a frivolous appeal is a drastic and unusual remedy, and should be reserved for those rare and unusual situations where an appeal on its face is totally devoid of merit. *Id.*

Applying those guidelines, we have concluded that although the issue of frivolity is close in this case, an award of damages to defendant under Rule 84.19 is not warranted. Defendant's motion is, accordingly, denied.

Judgment affirmed.

PREWITT, C.J., and HOGAN, P.J., and MAUS, J., concur.

---

1. The "U-haul" rental contract (Exhibit 2), as we decipher it, reflects that plaintiff made a deposit of $72.55 when he received the truck and was given a refund of $40 when he returned it. This *appears to coincide with plaintiff's testimony* that he paid $72.55 to get the truck, then "they refunded me some money when I brought the truck back."

2. Exhibit 10.