**OZARK MOUNTAIN TIMBER PRODUCTS, INC., Plaintiff-Respondent,**

v.

**Ben REDUS and Westbend Hardwood Lumber, Inc., Defendants-Appellants,**

v.

**N. Eugene BREUER, Third-Party Defendant-Respondent.**

No. 14517.

Missouri Court of Appeals, Southern District, Division One.

March 3, 1987.

Frederick W. Martin III, West Plains, for defendants-appellants.

Richard H. Stevens, Lewis & Stevens, and Mark C. Fels, Poole, Smith & Wieland, P.C., Springfield, for plaintiff-respondent and third-party defendant-respondent.

CROW, Chief Judge.

Defendants Ben Redus ("Redus") and Westbend Hardwood Lumber, Inc. ("Westbend") appeal from a judgment against them on a four-count petition filed by Ozark Mountain Timber Products, Inc. ("OMTP"). Defendants maintain that the trial court erred in allowing their attorney to withdraw two weeks before trial, and that the evidence was insufficient to support the judgment on three of the counts.

By defendants' answer to the petition, the following facts were admitted.

Westbend, a California corporation, is licensed to do business in Missouri. Redus, president of Westbend, was at all pertinent times acting within the scope and course of his employment by Westbend. Beginning in June, 1981, OMTP, at the request of Westbend, performed "kiln drying and surfacing" on lumber owned by Westbend, and also provided storage and insurance for such lumber.

Having noted those facts, we now focus on the individual allegations of the separate counts.

Count I averred that the prices charged by OMTP for the above-mentioned services were "understood and agreed to" by Westbend, were "reasonable and proper," and were "to be paid on demand." Count I further alleged that as of August 9, 1982, Westbend owed OMTP $10,859.70 for such services, and that OMTP demanded payment of that sum on that date, but Westbend failed and refused to pay said sum then or at anytime thereafter. Count I prayed for judgment against Westbend, alone, for $10,859.70, with interest from August 9, 1982.

Westbend answered Count I by denying its allegations.

Count II pleaded that in February, 1982, OMTP and Redus agreed that Westbend would pay OMTP for storage of Westbend's lumber before such lumber was removed from OMTP's possession, and that none of Westbend's lumber would be removed without payment. Count II added that during the period from July 26 through August 2, 1982, Westbend, at Redus' direction, removed over 100,000 feet of its lumber from OMTP's possession, giving OMTP a $2,669.55 check on July 27, and a $3,400.00 check on July 29. Both checks, said Count II, were drawn by Redus on a bank account of Westbend; upon presentation to the drawee bank, both checks were dishonored "due to insufficient funds." Count II asserted that OMTP released the lumber to defendants relying on Redus' representations that the checks would be paid upon presentation. Defendants, according to Count II, knew said representations were false, and intended that OMTP rely thereon in releasing said lumber. Count II prayed for judgment against both defendants for $6,069.55, the sum of the two checks.

Defendants' answer admitted delivery of the two checks to OMTP, admitted both checks were dishonored because of insufficient funds, and denied the other allegations of Count II.

Count III of the petition repeated the allegations of Count II, and added that the conduct of defendants was willful, intentional and malicious. Count III prayed for $25,000 exemplary damages against Redus and $100,000 exemplary damages against Westbend.

Answering Count III, defendants denied that their conduct was willful, intentional or malicious.

Count IV of the petition, filed (with leave of court) while the suit was pending, alleged that OMTP, in 1979, entered into an agreement with defendants by which a "Straitoplaner" owned by OMTP was leased to defendants. Count IV averred that defendants owed OMTP $3,536.97 under such agreement, and prayed for judgment against each defendant in that amount.

Defendants filed no responsive pleading to Count IV.

While the suit was still in the pleading stage, Westbend filed an "amended counterclaim" consisting of 10 counts. That pleading alleged that N. Eugene Breuer ("Breuer") was OMTP's president and chief operating officer, and named him as a

"counterclaim defendant." Several of the counts of the amended counterclaim sought relief against Breuer. For reasons that shall become apparent *infra*, we need not describe the individual counts of the amended counterclaim. It is sufficient merely to note that OMTP and Breuer, by their attorney, replied to each count of the amended counterclaim.

On May 24, 1985, defendants' attorney, henceforth referred to as "C_____," sent a letter to the circuit clerk and to the attorney for OMTP and Breuer. The letter stated that the trial court had set the case for jury trial beginning August 8, 1985, at 10 a.m.

On July 25, 1985, C_____ filed in the trial court a motion to withdraw as defendants' attorney. The motion stated that C_____, by letter accompanied by a copy of the motion, had advised Redus and Westbend of the decision to withdraw and of the necessity of obtaining representation promptly. That same day the trial court entered an order permitting C_____ to withdraw. A copy of the motion and the order was mailed by the circuit clerk to Redus that date.

On August 8, 1985, the trial court called the case for trial. Breuer appeared in person and by attorney, and OMTP appeared by the same attorney. Redus failed to appear, and no attorney appeared for him or for Westbend.

The trial court, without the aid of a jury, heard OMTP's evidence, which consisted of testimony by Breuer.

Identifying himself as the president and manager of OMTP, Breuer recounted that OMTP did business with Westbend during the years 1979 through 1982, and that in doing so OMTP dealt with Redus "throughout the whole experience." As to the individual counts of the petition, we summarize first the testimony regarding Counts II and III.

Breuer testified that early in 1982, OMTP had some 100,000 feet of Westbend's lumber in storage. Breuer explained that OMTP needed to use the warehouse space for other purposes, so he asked Redus to remove the lumber and pay the accrued charges. Redus, according to Breuer, agreed to pay for each load as it was taken out.

For the next several months, said . Breuer, Redus "would pick up a load and give us a check for it, and those checks were always good." On July 27, 1982, Redus picked up a load of lumber and gave OMTP the $2,669.55 check mentioned *supra;* two days later, Redus picked up another load, giving OMTP the $3,400.00 check mentioned *supra.* Both checks, as heretofore explained, were returned unpaid by the drawee bank, though when this occurred is not disclosed.

Breuer testified that around August 7 or 8, 1982, while he was on vacation, Redus picked up the final load of Westbend's lumber from OMTP, amounting to roughly 50,000 to 60,000 board feet. Redus, according to Breuer, said he forgot to bring a check, but would bring it the next day. Redus never delivered the check.

As we comprehend Breuer's testimony, the amount due OMTP from Westbend for the final load was $4,790.15. We draw that inference because Breuer testified that the total amount due OMTP from Westbend as of August 9, 1982, was $10,859.70, and that said sum included the two dishonored checks, which total $6,069.55. Deducting the latter figure from $10,859.70 leaves $4,790.15.

The trial court evidently understood Breuer's testimony the same as us, as the trial court entered judgment in favor of OMTP and against Westbend on Count I of the petition for $4,790.15, with interest thereon at 9 per cent per annum from and after August 9, 1982. The trial court entered judgment in favor of OMTP and against both defendants on Count II of the petition for $6,069.55 (the sum of the two checks), with interest at 9 per cent per annum from and after August 9, 1982.

As to Count III of the petition, the trial court entered judgment in favor of OMTP and against Redus for $18,208.65, and in favor of OMTP and against Westbend for $18,208.65. Those amounts are treble the sum of the two checks.

As to Count IV of the petition, Breuer testified that only $1,658.93 was due OMTP, which was less than half the prayer. The trial court entered judgment in favor of OMTP and against Westbend on Count IV for $1,658.93, with interest at the "legal rate" from and after the date of trial.

The judgment included a finding against defendants on all counterclaims against OMTP, and against defendants on all "third party claims" against Breuer.

After entry of the judgment (filed September 9, 1985), no action was taken by defendants until October 21, 1985. On that date, by their present counsel, defendants filed a notice of appeal.[1]

Before considering defendants' assignments of error, we must address a motion filed by OMTP and Breuer, henceforth referred to collectively as "respondents," wherein they seek an order from us dismissing the appeal. Respondents insist that because defendants filed no motion in the trial court to set aside or vacate the judgment, or to obtain any other post-judgment relief, defendants are foreclosed from maintaining this appeal. In support of that hypothesis, respondents cite *Vonsmith v. Vonsmith*, 666 S.W.2d 424 (Mo. banc 1984), and *Barney v. Suggs*, 688 S.W.2d 356, 358[1, 2] (Mo. banc 1985).

Neither case is factually identical to the instant case. In each of the cited cases, the party who was sued filed no responsive pleading within the time allowed, and a judgment by default was entered in favor of the suing party. The sued party thereafter filed no motion to set aside or vacate the judgment, but instead filed a notice of appeal. In each case, the Supreme Court of Missouri held that a default judgment is not appealable absent a motion by the defaulting party to set aside or vacate the judgment.

The instant case differs from *Vonsmith* and *Barney* in that here, defendants filed an answer to Counts I through III of the petition. Consequently, as to those counts, there was no default *nihil dicit*.[2]

■ While a judgment entered against a party who fails to appear for trial on the scheduled date may be referred to as a "default judgment," see *Metts v. Metts*, 625 S.W.2d 896 (Mo.App.1981), and *G.H. Kursar, D.O., Inc. v. Fleischer*, 602 S.W.2d 870 (Mo.App.1980), such a judgment is not of the same genre as a judgment by default *nihil dicit*. Indeed, it has been said that in cases where the pleadings are filed, the issues are made up, the cause comes on for trial, the defendant fails to appear, the plaintiff presents evidence, and the court enters judgment for the plaintiff, such judgments are judgments on the merits, not default judgments. *Kursar*, 602 S.W.2d at 873; *Hamm v. Hamm*, 437 S.W.2d 449, 452[1] (Mo.App.1969). The label "default judgment" in such circumstances has been branded a misnomer. *Weber v. Hoesch*, 603 S.W.2d 60, 61 (Mo.App.1980).

■ Respondents do not cite, and our independent research has not found, a case where a motion to set aside or vacate a judgment entered under circumstances like those here has been held to be a condition precedent to an appeal. Were we to grant respondents' motion, we would be extending the rule of *Vonsmith* to a situation where such rule has never, to our knowledge, been applied. In view of the criticism of *Vonsmith* expressed by certain members of the Supreme Court of Missouri, i.e., opinion of Blackmar, J., in *Vonsmith*, 666 S.W.2d at 425–26, and opinions

---

1. The deadline for filing the notice of appeal would ordinarily have been October 19, 1985. Rules 81.04(a) and 81.05(a), Missouri Rules of Civil Procedure (16th ed. 1985). However, that date fell on a Saturday. Under Rule 44.01(a), the deadline was extended to Monday, October 21.

2. Default *nihil dicit* is default for failure to file a responsive pleading within the time allowed after service of summons. *O'Connor v. Quiktrip*

*Corp.*, 671 S.W.2d 17 (Mo.App.1984); *Smith v. Sayles*, 637 S.W.2d 714 (Mo.App.1982). Such a default admits the traversable allegations of the petition as to the cause of action pleaded, in effect admitting injury to the plaintiff by the violation of a legally protected interest, but the default does not admit that damages resulted from that injury. *O'Connor*, 671 S.W.2d at 19[1]; *Smith*, 637 S.W.2d at 717.

of Welliver, J., and Blackmar, J., in *Barney*, 688 S.W.2d at 362–67, we are unpersuaded that the Supreme Court would apply *Vonsmith* in the instant case. Respondents' motion to dismiss defendants' appeal is, accordingly, denied.

■ That does not mean, however, that we are obliged to consider each assignment of error raised by defendants in their brief. It is well established that an appellate court will not, on review, convict a trial court of error on an issue which was not put before it to decide. *Lincoln Credit Co. v. Peach*, 636 S.W.2d 31, 36[12] (Mo. banc 1982), *appeal dismissed*, 459 U.S. 1094, 103 S.Ct. 711, 74 L.Ed.2d 942 (1983); *School District of Kansas City v. Smith*, 342 Mo. 21, 111 S.W.2d 167, 168 (1937). That principle is noted in the opinion of Blackmar, J., concurring in part and dissenting in part in *Vonsmith:*

"The rule enunciated in the principal opinion, that a litigant should not be afforded relief on appeal as to matters which could have been, and were not, presented to the trial court, is eminently sound, and our appellate courts are entirely justified in applying it to cases which come before them." 666 S.W.2d at 425–26.

Guided by that maxim, we turn to defendants' first point, which avers that the trial court erred in granting C_____'s motion to withdraw as their attorney. Defendants argue that they were prejudiced by such ruling, as (a) the case was scheduled for jury trial two weeks hence, (b) C_____ failed to obtain a continuance to enable them to find other counsel, and (c) no counsel they could have retained could have gotten ready for trial by the appointed date.

While C_____'s withdrawal may well have placed defendants in a quandary, it does not necessarily follow that defendants are entitled to relief on appeal. Defendants concede that C_____ mailed them a copy of the motion to withdraw on July 17, 1985, and that the circuit clerk mailed Redus a copy of the order granting C_____ leave to withdraw on July 25, 1985. Nothing in the record indicates that defendants,

anytime before trial, complained to the court about C_____'s withdrawal or asked the court to reconsider its ruling, nor does the record indicate that defendants, after learning that C_____ no longer represented them, made any effort to obtain a continuance so that they could enlist other counsel.

Defendants complain that C_____ gave no valid reason for moving to withdraw, and that they were afforded no opportunity to be heard before C_____'s motion was granted. We must remember, however, that the issue before us is not whether C_____ had sufficient grounds for withdrawal, or whether C_____ was derelict in failing to request a continuance to allow defendants time to employ other counsel. This is not a suit by defendants against C_____ for abandoning them a fortnight before trial; it is a suit between businesses and businessmen over delinquent debts.

We find it noteworthy that on August 27, 1985, 19 days after trial and 13 days before the judgment was entered, the circuit clerk, according to the docket sheet, mailed a copy of the docket sheet to Redus. The docket sheet showed, among other things, that the cause had been tried on August 8, that defendants had been declared in default for failure to appear, that OMTP had presented its case, and that the court had made certain findings. At no time thereafter did defendants bring before the trial court the assignment of error they now raise in the first point of their brief.

Their failure to do so has not gone unnoticed by respondents, who fervently argue that if defendants had raised the issue of C_____'s withdrawal in the trial court, respondents could have shown that C_____, on July 17, 1985, informed Redus of C_____'s decision to withdraw, and that Redus consented. Additionally, say respondents, they could have shown that Redus and Westbend were fully aware that the trial was scheduled for August 8, 1985. Defendants' failure to raise the issue of C_____'s withdrawal in the trial court has, according to respondents, deprived them of the opportunity to make the showing outlined above.

We find merit in respondents' position. This is not a case where defendants first learned after trial that their lawyer had withdrawn, nor is it a case where defendants became aware that the case had been tried only after it was too late to ask the trial court for relief from the judgment. As noted earlier, the circuit clerk, 13 days before the judgment was entered, sent Redus a copy of the docket entry showing that the trial had taken place August 8, 1985. Consequently, defendants had ample opportunity—before and after the judgment was entered—to present to the trial court the contentions they now assert in their first assignment of error. Having neglected to do so, they should not, in our opinion, be permitted to raise those issues here.

*Murray v. Sanders*, 667 S.W.2d 426 (Mo. App.1984), relied on by defendants in support of their first point, does not aid them. In *Murray*, as here, the attorney for the defending parties (the Sanderses) withdrew shortly before trial, and promptly notified the Sanderses of his withdrawal. However, he apparently neglected to inform them that the case was, at that time, scheduled for trial the following week. The plaintiffs appeared with counsel on the appointed date. The Sanderses failed to appear. The plaintiffs presented evidence and obtained a judgment. The Sanderses first learned of the judgment when they received a statement for costs from the court clerk.

The Sanderses, unlike defendants here, promptly employed counsel and filed a motion to set the judgment aside. Following an *evidentiary hearing*, at which the foregoing facts were developed, the trial court denied the motion. On appeal, it was held that in order to secure relief, the Sanderses were obliged to show a meritorious defense, reasonable diligence or excuse for nonappearance at trial, and that the adverse parties would suffer no substantial injury from the delay occasioned by a new trial. *Id.* at 428[2].

Applying the facts *established at the evidentiary hearing* to those requirements, the appellate court in *Murray* reversed the judgment and remanded the cause for retrial.

The differences between *Murray* and the instant case are immediately apparent. In *Murray*, the Sanderses gave the trial court the opportunity to hear evidence regarding their failure to appear, and to determine whether, given those circumstances, the judgment should be allowed to stand. As the matter was fully aired in the trial court, the appellate court had a record on which to review the trial court's decision on that issue. We have no such opportunity in the instant case.

A perceptive reader will also note that the appellate court in *Murray* did not concern itself with whether the trial court was correct in allowing the Sanderses' lawyer to withdraw, or whether the lawyer was remiss in his handling of the matter. Instead, as we have seen, the issues on which appellate relief hinged were whether the Sanderses had shown a meritorious defense, reasonable diligence or excuse for nonappearance at trial, and that the adverse parties would suffer no substantial injury if a new trial were ordered.

In the instant case, defendants make no attempt to demonstrate that they qualify for relief under the requirements of *Murray*, nor, indeed, could they do so, as they neglected to present evidence to that effect in the trial court.

In one segment of the argument under their first point, defendants assert the trial court should have continued the cause *sua sponte*. That contention, like the others in defendants' first point, was never voiced in the trial court. One must bear in mind that the trial court, at the time it granted C_____'s motion to withdraw, had no way of knowing whether defendants wanted to engage other counsel. At that time, the cause had been pending almost three years, and the trial court could have easily assumed that defendants (a) believed they had postponed the day of reckoning as long as they could, (b) recognized they had no chance of prevailing at trial, and (c) had decided against spending any more money for attorney fees. Defendants' failure to appear at trial was consistent with such an

inference. We will not convict the trial court of error in failing to continue the case on its own motion when defendants never raised that issue below.

■ As emphasized earlier, we do not have here a case where defendants had no chance to assert, in the trial court, the arguments they now tender in their first point. What course, if any, defendants might be able to pursue if they had had no such opportunity is a question we need not, and do not, address. Our holding is confined to the facts before us, and on those facts we rule that defendants are foreclosed from raising their first assignment of error.

That ruling, so far as we can determine, disturbs no reported Missouri case. We know of no Missouri appellate decision where a party who had filed an answer but subsequently (1) failed to appear for trial, and (2) thereafter neglected to seek relief from the judgment in the trial court, was allowed, on direct appeal, to contend that the trial court erred in proceeding with the trial in such party's absence.

Defendants offer no explanation for their failure to present to the trial court the contentions they assert in their first assignment of error. As no justification for their neglect appears in the record, we hold that defendants cannot raise those issues in this appeal.

Defendants' second point maintains that the trial court erred in awarding OMTP $4,790.15 against Westbend on Count I of the petition, in that there was no proof that OMTP's charges for its services were "correct and reasonable." Defendants' second point, in our view, is a proper one for our consideration, as the trial court heard OMTP's evidence, and thus had an opportunity to determine whether such evidence was sufficient to support the relief awarded on Count I. Accordingly, we shall decide defendants' second point on the merits.

In doing so, we are mindful of the scope of our review in this court-tried case. The judgment of the trial court will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneous-

ly declares the law, or unless it erroneously applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32[1] (Mo. banc 1976). Furthermore, where, as here, the trial court made no findings of fact or conclusions of law, all fact issues shall be considered as having been found in accordance with the result reached, Rule 73.01(a)(2), Missouri Rules of Civil Procedure (16th ed. 1985), and the judgment will be upheld under any reasonable theory supported by the evidence. *O'Bar v. Nickels*, 698 S.W.2d 950, 955[1] (Mo.App.1985); *Elliott v. West*, 665 S.W.2d 683, 689–90[4] (Mo.App.1984).

Arguing their second point, defendants insist that inasmuch as their answer denied the averments of Count I, OMTP was obliged to prove not only the "individual charges" for which it sought recovery on that count, but also that such charges were correct and reasonable. Defendants assert that Breuer's testimony failed to satisfy either of those requirements.

Respondents, in their brief, do not attempt to uphold the judgment on Count I on an "open account theory." Instead, respondents maintain that the evidence established that Westbend was liable for the amount awarded on Count I "on the theory of an account stated."

In support of that theory, respondents point to the two dishonored checks written, respectively, on July 27 and 29, 1982. According to respondents, the issuing of those checks by Redus, in the respective amounts of $2,669.55 and $3,400.00, constituted an acknowledgement by Redus (and consequently Westbend) that the amounts due OMTP for the lumber removed by Redus on July 27 and 29, were, respectively, $2,669.55 and $3,400.00.

Additionally, argue respondents, Breuer's testimony established that when Redus picked up the final load a few days later, he promised to bring a check the following day for the amount due on that load. That amount, say respondents, was $4,790.15. Respondents arrive at that figure by deducting the sum of the two checks ($6,069.55) from the aggregate owed OMTP by Westbend ($10,859.70). It follows, ac-

cording to respondents, that Redus and Westbend knew, as of August 9, 1982, that OMTP was demanding $10,859.70 as the amount owed by Westbend on its account, said sum consisting of the charges for the loads ostensibly paid by the two checks, and the charge for the final load, for which a check was promised but never sent. Citing *Chisler v. Staats,* 502 S.W.2d 424 (Mo. App.1973), respondents proclaim that as of August 9, 1982, an account was stated between OMTP and Westbend, whereby the latter owed the former $10,859.70.

*Chisler* teaches that an account stated is an agreement between parties, having had previous financial transactions, that a balance struck is correct and due between them, and a promise by the debtor, either express or implied, to pay the balance. *Id.* at 426[1]. It is a new cause of action arising from the prior monetary transactions, and amounts to an admission of liability by the debtor. *Id.* at 426[2–3]. If the debtor makes no express promise to pay, the retention of the account rendered for a reasonable time without objection admits to the account and implies a promise to pay. *Id.* at 426[5]. The circumstances of a particular case determine the reasonable period of time that an account may be retained without objection. *Id.* at 427.

Applying those principles to OMTP's evidence, we find it sufficient to support the judgment on Count I on the theory of an account stated. The two checks Redus gave OMTP established that Westbend recognized it owed OMTP at least $6,069.55 (the sum of those checks). Redus' promise, when he picked up the last load a few days later, to pay for it by check, is sufficient, in our view, to establish an account stated as to the remainder of the debt, which, as we have seen, was $4,790.15, the charge for the last load.

While the evidence is hardly compelling, it is nonetheless sufficient to support an inference that Redus did not dispute the amount charged by OMTP for the final load at the time he picked it up. His promise to return the following day with a check implies an admission of liability for such amount. Breuer testified it was only after the litigation commenced that Redus and Westbend disputed the amount due on Westbend's account.

The trial court was careful to award OMTP no more than the evidence warranted. As noted earlier, the judgment on Count I of the petition was for only $4,790.15, which represented Westbend's unpaid account minus the two dishonored checks (which were covered by the judgment on Count II).

Having concluded that OMTP's evidence was sufficient to support the judgment on Count I on the theory of an account stated, we reject defendants' second assignment of error.

Defendants' third, and final, point asserts that the award of $6,069.55 in actual damages on Count II of the petition and $18,208.65 in punitive damages on Count III of the petition was erroneous, in that there was no substantial evidence that defendants "had committed an actionable fraud." Defendants aver that their delivery of the two "bad checks" in return for the release of two loads of their lumber was insufficient to establish that they knew, at the time the checks were uttered, that they would not be paid. Additionally, say defendants, OMTP sustained no "pecuniary loss," as OMTP gave up only a "common law artisan's lien for possession that was not subject to foreclosure," while retaining a claim on an open account.

This point, like defendants' second point, is cognizable on appeal, as the sufficiency of the evidence to support the judgment on Counts II and III was a matter the trial court had to consider in entering judgment on those counts.

Defendants begin their argument by attempting to liken the uttering of the checks to a promisor's failure to carry out a promise. Defendants assert that their failure "to carry through on their agreement by paying the checks does not, by itself, establish fraud," and they cite cases standing for the proposition that an action for fraud cannot be predicated on the failure of a promisor to honor his promise to do, or to refrain from doing, a future act. Those

cases, however, are inapposite, as none involved passing an insufficient funds check.

Here, defendants, in their answer, solemnly admitted that the checks were dishonored because of insufficient funds. Section 570.120.3, RSMo 1978, provides:

"If the issuer has an account with the drawee, failure to pay the check or order within ten days after notice in writing that it has not been honored because of insufficient funds or credit with the drawee is prima facie evidence of his purpose to defraud and of his knowledge that the check or order would not be paid."

■ OMTP's petition, served on defendants almost three years prior to trial, gave defendants notice in writing that the checks had been dishonored because of insufficient funds. At no time after service of the petition did Redus or Westbend pay either of the checks. OMTP was consequently entitled, at trial, to avail itself of the prima facie evidence of intent to defraud supplied by § 570.120.3. As there was no evidence to the contrary, the statutory inference of fraudulent intent was sufficient to support that element of Counts II and III. The first component of defendants' third point is, therefore, without merit.

As to the remaining component of their third point, defendants insist that a party seeking recovery for fraud must prove, among other things, that he has suffered pecuniary loss. From that starting point, defendants embark on a prolix discussion of the law of liens, and conclude by telling us that OMTP had only a common law artisan's lien on Westbend's lumber for the value of OMTP's services in kiln drying and surfacing it. That lien, say defendants, "was not capable of being foreclosed"; all OMTP could do was maintain possession of the lumber until the lienable charges were paid. Consequently, argue defendants, OMTP sustained no pecuniary loss when it surrendered possession of the two loads of lumber in exchange for the two bad checks.

It is unnecessary to determine whether defendants' analysis of the lien laws is sound. Irrespective of what rights OMTP might have enjoyed under those laws, it is clear from the evidence that Westbend, through Redus, had agreed with OMTP that the latter would be paid for each load of Westbend's lumber as it was picked up; ergo, OMTP had the right to retain possession of Westbend's lumber until all accrued charges thereon were paid. OMTP gave up that right in regard to the two loads paid for by the bad checks.

■ As respondents point out in their brief, had OMTP not surrendered that lumber, OMTP could have levied execution on it in an effort to satisfy the judgment, as Westbend posted no supersedeas bond on appeal. That remedy was no longer available once OMTP released the lumber, which was evidently worth several thousand dollars. In our opinion, those circumstances amply demonstrate that the bad checks caused OMTP pecuniary loss.

The second component of defendants' third point is denied, and the judgment is, in all respects, affirmed.

GREENE, P.J., and MAUS, J., concur.