**Mark C. GAAR and Leda Fay Gaar, Respondents,**

v.

**GAAR'S INC., Appellant.**

**No. 22375.**

Missouri Court of Appeals, Southern District, Division One.

June 22, 1999.

Kay A. Van Pelt, Van Pelt & Van Pelt, P.C., Springfield, for appellant.

David L. Smith, Cantwell, Smith & Trokey, LLP, Branson, for respondents.

CROW, Judge.

Plaintiffs filed a two-count petition against Defendant. Count I sought recovery on a $30,000 promissory note. Count II sought recovery on an alleged $5,000 loan evidenced by a check in that amount.

A non-jury trial resulted in judgment for Plaintiffs on both counts. Defendant appeals.

Dramatis personae:

Mark Clifford Gaar ("Cliff").[1] A plaintiff.

Leda Fay Gaar ("Leda"). The other plaintiff. Wife of Cliff.

Dwane C. Gaar ("Dwane").[2] Son of Cliff and Leda.

Lois M. Gaar ("Lois").

Gaar's Inc. ("Defendant"). A Missouri corporation chartered August 10, 1989.

Tommie Melton ("Melton"). Employee of Defendant from August 1989 until June 1, 1997.

\* \* \*

The trial court made no findings of fact. However, many facts were established by documents; other facts were established by uncontradicted testimony. Resolving the issues confronting this court requires a chronology of the facts.

Dwane and Lois were the sole incorporators of Defendant and the two original directors on Defendant's two-member board. At the outset of Defendant's existence, Dwane owned fifty percent of Defendant's shares; Lois owned the other fifty percent. At that time, Dwane and Lois were husband and wife.

From its inception, Defendant operated a "convenience store" in Branson called "Gaar's 3–G." Dwane, president of Defendant, managed the store. Lois, vice president and secretary of Defendant, "would handle the paperwork." Lois avowed—and Dwane conceded—that she and he always discussed "anything that was major," including loans, acquisition of equipment, leases and taxes.

In April 1995, Dwane and Lois resided in a house adjacent to the home of Cliff and Leda on the Gaar "family farm" in Walnut Shade. Lois "moved off the property" sometime that month and never returned.[3]

Dwane continued managing Gaar's 3–G after the separation.

Dwane testified that on November 27, 1995, Defendant needed money to operate Gaar's 3–G. According to Dwane, this "wasn't unusual in the winter." Dwane explained: "We needed extra operating cash because of the nature of the tourist business."

Cliff testified Dwane approached him about "making a loan to the corporation." Cliff issued a $30,000 check November 27, 1995, against his and Leda's account at First Community Bank of Taney County, payable to Dwane. The check, received in evidence as Plaintiffs' Exhibit 1, is henceforth referred to as "Exhibit 1."

After receiving Exhibit 1 from Cliff, Dwane gave it to Melton, who deposited it that day (November 27, 1995) into the account of Gaar's 3–G at Great Southern

---

**1.** Among the exhibits received in evidence is a letter written by Mark Clifford Gaar which he signed "Cliff." As shall become apparent *infra*, four individuals mentioned in this opinion bear the surname Gaar. For convenience and clarity, this opinion refers to each, respectively, by a forename. No disrespect is intended.

**2.** This forename is spelled "Dwayne" in the transcript, but is spelled "Dwane" in signatures on several exhibits received in evidence.

This court assumes the latter spelling is correct.

**3.** Dwane testified there was an earlier separation, possibly in 1993, during which he and Lois "went through counseling." Although they resumed cohabitation, this court gathers from Dwane's testimony that Lois continued to maintain a "residence" in Springfield.

Savings Bank in Branson ("Great Southern").[4]

Three days later, on November 30, 1995, Melton signed a $7,000 check drawn against the account of Gaar's 3–G at Great Southern, payable to Dwane. At his direction, she endorsed his name "for deposit" on the reverse side of the check and deposited it into his personal account.[5]

The following day, December 1, 1995, Lois tendered her resignation as secretary of Defendant. At trial, Dwane and Lois identified a document denominated "Special Meeting of Board of Directors." The document recites that Defendant's board met at 1:00 p.m., December 1, 1995, accepted Lois's resignation as secretary, and immediately thereafter elected Melton secretary.

The note that is the subject of Count I of Plaintiffs' petition was prepared by Melton at Dwane's direction. It was received in evidence as Plaintiffs' Exhibit 3, and is henceforth referred to as "Exhibit 3." A copy of it is attached at the end of this opinion.

Although Exhibit 3 is dated November 30, 1995 (three days after Dwane received Exhibit 1 from Cliff), Melton testified she prepared Exhibit 3 "probably sometime in January [1996]."[6] Asked whether Dwane told her to date Exhibit 3 November 30, 1995, Melton replied: "No. I did that on my own[.]"

The only signature on Exhibit 3 is Melton's. Her testimony as to how that came about was:

"Q Did any of the prior drafts [of Exhibit 3] have [Dwane's] name as the signature?

A Yes.

Q And, did he request that to be deleted and your name to be put on instead?

A Yes."

Cliff testified that on April 14, 1996, Dwane asked him to make "a second loan to the corporation." Cliff issued a $5,000 check that date on the same account against which he had issued Exhibit 1 November 27, 1995. Like Exhibit 1, the $5,000 check was payable to Dwane. The $5,000 check, received in evidence as Plaintiffs' Exhibit 4, is henceforth referred to as "Exhibit 4."

After receiving Exhibit 4 from Cliff, Dwane "handled [it] the same as [Exhibit 1]." Melton deposited Exhibit 4 into Defendant's "corporate checking account" at Great Southern April 15, 1996.[7]

That same day (April 15, 1996), Dwane was served with a petition for dissolution of marriage filed by Lois.

Melton prepared a "financial report" for Gaar's 3–G dated June 30, 1996. It shows, *inter alia*, a "note payable" to "M C Gaar" in the amount of $35,000. As this court understands Melton's testimony, the $35,000 represents the $30,000 from Exhibit 1 (for which Exhibit 3—the note—was issued) and the $5,000 from Exhibit 4. No note was ever issued for the latter amount.

Lois testified she was granted a "divorce" from Dwane August 29, 1996.

Dwane testified he "wasn't at the divorce," as he "chose not to have an attorney." According to Dwane, "the divorce court ... awarded all of the corporate stock in Gaar's, Inc., to Lois." Lois "took over the corporate affairs after that time."

Cliff testified he believed he received one interest payment of $250 on Exhibit 3

---

4. The endorsement "Dwane Gaar" on the reverse side of Exhibit 1 appears to have been written by Melton.

5. Melton avowed the check was "payback" for a loan Dwane had made to Defendant.

6. Dwane agreed Exhibit 3 was prepared sometime after November 27, 1995. Dwane admitted, "I don't know exactly when."

7. The account number for that account is different than the number for the account of Gaar's 3–G. The reason Defendant maintained two accounts is unexplained.

from Defendant. However, Dwane testified Defendant made no payment to Plaintiffs on either Exhibit 3 or the $5,000 loan of April 14, 1996. Melton testified she wrote two checks for interest payments on Exhibit 3 but "held [them] up" at Dwane's instruction because "there wasn't enough money."

The trial court awarded Plaintiffs judgment against Defendant on Count I in the amount of $30,000 plus interest at ten percent per annum from November 30, 1995, and on Count II in the amount of $5,000 plus interest at nine percent per annum from April 14, 1996.

The first of Defendant's two points relied on attacks the award on Count I. The point avers the trial court erred in that "Defendant was not bound by [Exhibit 3] on which the Plaintiffs based their recovery because there was not substantial evidence to support a finding that ... Melton or Dwane ... were authorized to sign the note on behalf of the Defendant and/or such a finding is against the weight of the evidence."

■ Although legal theoreticians might concoct other hypotheses of error regarding the award on Count I, this court adheres to the well-entrenched doctrine that the questions for decision on appeal are those stated in the points relied on, and a question not there presented will be considered abandoned. *Pruellage v. De Seaton Corp.*, 380 S.W.2d 403, 405[3] (Mo. 1964); *Schmidt v. Warner*, 955 S.W.2d 577, 583[5] (Mo.App. S.D.1997). Inasmuch as Defendant's first point is Defendant's only attack on the award on Count I, this court shall determine only whether that part of the judgment is vulnerable to that specific attack.

■ Appellate review of a judge-tried case is governed by *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). There, the court construed the predecessor of Rule 73.01(c)[8] to mean that the judgment will be affirmed unless there is no substan-

tial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Id.* at 32[1].

■ In applying the above standard, an appellate court defers to the trial court's determinations of credibility, viewing the evidence and permissible inferences therefrom in the light most favorable to the judgment and disregarding all contrary evidence and inferences. *Mehra v. Mehra*, 819 S.W.2d 351, 353[2] (Mo. banc 1991). That is because credibility of witnesses and the weight to be given their testimony is a matter for the trial court, which is free to believe none, part, or all of any witness's testimony. *Herbert v. Harl*, 757 S.W.2d 585, 587[1] (Mo. banc 1988). Where, as here, a trial court makes no findings of fact, all fact issues shall be considered as having been found in accordance with the result reached, Rule 73.01(a)(3), and the judgment will be upheld on any reasonable theory supported by the evidence. *Weatherwax v. Redding*, 953 S.W.2d 162, 167[5] (Mo.App. S.D.1997); *Lawson v. Traders Ins.*, 946 S.W.2d 298, 299–300[3] (Mo.App. S.D.1997).

In response to Defendant's first point, Plaintiffs maintain Dwane and Melton, as president and secretary, respectively, of Defendant, had actual and apparent authority to borrow money for "operating capital" and to execute Exhibit 3 on Defendant's behalf.

This court begins its consideration of Defendant's first point by observing that Exhibit 3 is not in the traditional form of a promissory note executed by a corporation. As explained in *Fletcher*, Cyclopedia of the Law of Private Corporations § 3039 (1997), while there is no fixed form in which commercial paper must be signed by a corporation, it is "generally signed with the corporate name, by the president or some general officer other than the secretary." According to *Fletcher*, a proper

**8.** References to rules are to Missouri Rules of Civil Procedure (1999).

method of executing a note is to place the corporate name at the foot, such as: _____, Inc., by _____, President, and _____, Secretary, with both officers affixing their respective signatures at the designated places. *Id.*

In the instant case, Exhibit 3 recites that Defendant promises to pay the designated sum at the specified interest rate. However, at the foot of Exhibit 3, the "Maker" is shown (in typewriting) as "Dwane C. Gaar." Beneath Dwane's typewritten name is the word "By," followed by Melton's signature. Beneath the signature is the typewritten designation "Secretary."

While labeling Dwane as "Maker" at the foot of Exhibit 3 might provide the basis for an argument that the maker of Exhibit 3 was Dwane, not Defendant, this court does not read Defendant's brief as tendering that argument. As this court comprehends Defendant's first point, Defendant's theory of error is that Defendant is not liable on Exhibit 3 because neither Dwane nor Melton possessed authority to sign Exhibit 3 on Defendant's behalf. This court does not read Defendant's brief as saying Defendant is immune from liability on Exhibit 3 because the maker of Exhibit 3 was Dwane, not Defendant.

Another possible ambiguity in Exhibit 3 is whether Melton, in affixing her signature, was acting for (a) Defendant, or (b) Dwane—who, in turn, was acting for Defendant. Inasmuch as (1) Melton's signature appears beneath Dwane's typewritten name, and (2) Melton's signature is preceded by the word "By," one could possibly infer Melton was acting for Dwane when she signed. Said another way, did Dwane intend that he execute Exhibit 3 on Defendant's behalf as president, and did he merely delegate to Melton the duty of signing Exhibit 3 for him, or (2) did Dwane and Melton intend that Melton—not Dwane—execute Exhibit 3 on Defendant's behalf?

As this court comprehends Defendant's brief, Defendant takes the position that Melton undertook to sign Exhibit 3 on Defendant's behalf, not on behalf of Dwane (who, as Defendant's president, would have been acting for Defendant). This court gathers from Plaintiffs' brief that they also embrace the notion that Melton executed Exhibit 3 on Defendant's behalf. Those positions are consistent with Melton's testimony that earlier drafts of Exhibit 3 were prepared for Dwane's signature, but at his request the final version was prepared for her signature, not his.

Consequently, the issue this court will resolve in adjudicating Defendant's first point is whether Melton had authority to execute Exhibit 3 on Defendant's behalf, thereby binding Defendant to the terms of Exhibit 3.

Citing *First National Bank of Clayton v. Frisco Park Realty Co.*, 510 S.W.2d 59, 61[1] (Mo.App.1974), Defendant emphasizes that the secretary of a corporation has no inherent power to sign the corporation's name to obligations for payment of money. Additionally, Defendant reminds this court that the power of a corporate officer, like that of any other agent, to bind his corporation in contract rests either upon his actual authority or his apparent authority. *Parks v. Midland Ford Tractor Co.*, 416 S.W.2d 22, 26[7] (Mo.App. 1967). A corporate officer's actual authority derives, on the one hand, from statute or from the articles and by-laws of the corporation, or on the other hand from the officer's exercise of functions on behalf of the corporation, long tacitly acquiesced in by the board of directors. *Id.* at [8].

Defendant points out that its articles of incorporation conferred no authority on its secretary to execute promissory notes on its behalf, and Defendant never adopted any by-laws. Furthermore, Dwane testified he and Lois conducted no board meeting "to authorize ... Melton to sign [Exhibit 3]." Finally, Lois avowed that as a

board member,[9] she never authorized Melton to sign Exhibit 3 on behalf of Defendant.

Plaintiffs respond by pointing out that according to *Sparks v. Despatch Transfer Co.*, 104 Mo. 531, 15 S.W. 417, 419 (1891):

"The president of a business corporation is its chief executive officer. He may, without any special authority from the board of directors, perform all acts of an ordinary nature, which by usage or necessity are incident to his office, and may bind the corporation by contracts in matters arising in the usual course of business."

Ninety years after *Sparks,* the Eastern District of this court said:

"Although the president of a corporation is empowered to transact without special authorization from the board of directors all acts of an ordinary nature which are incident to his office by usage or necessity which extends even to authority to bind the corporation for the execution and transfer of negotiable paper in the ordinary course of company business, such power to bind the principal by making, accepting or endorsing negotiable paper is an important power, susceptible to abuse and dangerous in its consequences to the company. It is obvious that authority of this nature is limited to the transaction of the corporation's regular business and for the benefit of the corporation."

*Molasky Enterprises, Inc. v. Carps, Inc.,* 615 S.W.2d 83, 87[7] (Mo.App. E.D.1981), citations omitted.

Plaintiffs maintain that inasmuch as Dwane was president of Defendant, he was authorized to borrow—on Defendant's behalf—$30,000 from them November 27, 1995, for operating capital for Defendant, and was authorized to instruct Melton to prepare and sign—on Defendant's behalf—Exhibit 3 evidencing the loan.

Plaintiffs point out that Dwane and Lois, prior to separating, borrowed money from Plaintiffs several times when Defendant needed funds. On some of those occasions, Dwane and Lois signed notes in their individual capacities, payable to Plaintiffs. The borrowed funds "went into the corporation." Lois testified, without contradiction by Dwane, that Defendant paid the notes.

Responding to Plaintiffs' argument, Defendant insists Dwane was not authorized to borrow funds on his own for operating capital for Defendant. Defendant emphasizes that on past occasions when Defendant needed operating capital, Dwane and Lois always agreed on borrowing the necessary funds. In contrast, Dwane did not consult Lois before borrowing the $30,000 from Plaintiffs on November 27, 1995, and Lois avowed she was unaware of that loan until "the night before the divorce."

In an apparent attempt to justify borrowing the $30,000 without consulting Lois, Dwane testified that Lois "wasn't communicating with me at all." Dwane added that when he obtained that loan and the subsequent $5,000 loan, he was "under the impression" that he would end up owning Defendant, as Lois had told him she "didn't want to have anything to do with it."

Lois conceded that when she filed the dissolution action, she thought Dwane would "receive the corporation and the convenience store in the divorce." However, she ultimately jettisoned that notion when she "found out through the banker and CPA that [Dwane] was going to lose both of them if I didn't take them over." She acquired that information sometime after April 1996.

Having weighed the parties' arguments and studied the authorities on which they rely, this court holds that if, *prior to November 27, 1995* (the date Cliff issued Ex-

9. Although Lois resigned as Defendant's secretary December 1, 1995, she never resigned as a director or vice president.

hibit 1):(a) Dwane had negotiated loans for operating capital for Defendant without consulting Lois, (b) Dwane had signed notes to the lenders on Defendant's behalf, as its president, without consulting Lois, and (c) Lois, after learning of Dwane's actions, had acquiesced in them by registering no objection when Defendant used the borrowed funds for operating capital, the trial court could have reasonably found that Dwane, as president of Defendant, had authority to negotiate the loan of November 27, 1995, and to delegate to Melton the authority to sign Exhibit 3 for Defendant. Such a finding would be consistent with the holding in *Sparks*, 15 S.W. at 419, that the president of a corporation may, without any special authority from its board of directors, perform all acts of an ordinary nature which by *usage* or *necessity* are incident to his office, and may bind the corporation by contracts in matters arising in the usual course of business.

■ However, the uncontradicted evidence in the instant case was that prior to November 27, 1995, Dwane and Lois (the sole members of Defendant's two-director board) always discussed loans for Defendant's corporate purposes. There was no evidence that prior to November 27, 1995, Dwane ever acted alone in borrowing money on Defendant's behalf. Consequently, although Dwane had been president of Defendant for more than six years prior to November 27, 1995, it never became "ordinary" for him to obtain loans for Defendant without prior approval of Defendant's board of directors, nor did obtaining loans for Defendant without board approval ever become incidental to Dwane's presidency "by usage."

There was likewise no evidence to support a finding that Dwane, as president of Defendant, was *authorized by necessity* to borrow $30,000 for Defendant's corporate purposes on November 27, 1995, without approval of Defendant's board.

This court does not ignore Dwane's testimony that at that time, Lois "wasn't communicating with [him] at all" and that Lois wrote him letters saying she "didn't want anything to do with the corporation."

Despite that testimony, Dwane conceded that on December 1, 1995 (three days after Cliff issued Exhibit 1), Lois and he (Dwane) signed a document required by a bank (not Great Southern) as a condition of loaning Defendant $65,033. The document ("Exhibit J") certifies that Defendant's board of directors adopted a resolution authorizing its president and secretary, or their successors, to procure the loan from the bank and to execute "notes and other evidences" of the loan. Pursuant to Exhibit J, Lois and Dwane, as secretary and president, respectively, of Defendant, signed a $65,033 note to the bank on Defendant's behalf.[10]

The evidence in the preceding paragraph refutes any contention that Dwane, as Defendant's president, was authorized by necessity to procure the $30,000 loan from Plaintiffs on Defendant's behalf without board approval on November 27, 1995. Inasmuch as Lois, as a director of Defendant, approved Defendant's borrowing $65,033 on December 1, 1995, it is evident she would have been available three days earlier to decide, as a director of Defendant, whether Defendant should borrow $30,000 from Plaintiffs (or anyone else).

This court therefore holds the evidence insufficient to support a finding that Dwane had authority to borrow $30,000 from Plaintiffs on Defendant's behalf on November 27, 1995, without approval of Defendant's board of directors.[11] It neces-

10. Dwane explained that the $65,033 was to be used to purchase inventory for another store he had contracted to buy. Lois confirmed that she signed Exhibit J and the note as Defendant's secretary on December 1, 1995 (the day she resigned as secretary). Ac-

cording to Lois, she resigned at 1:00 p.m., after signing Exhibit J and the note earlier that day.

11. This court uses the term "authority" to encompass both actual authority and implied

sarily follows that Dwane was unauthorized to delegate to Melton the authority to sign Exhibit 3 for Defendant.

The only other way Melton could have possessed authority to sign Exhibit 3 for Defendant would be if the office of secretary—which she occupied at the time she signed Exhibit 3—was vested with authority to sign promissory notes for Defendant.

■ As reported earlier in this opinion, the secretary of a corporation has no inherent power to sign the corporation's name to obligations for payment of money. *First National Bank of Clayton,* 510 S.W.2d at 61[1]. The record is bare of any evidence that Defendant ever conferred on its secretary the power to sign promissory notes on its behalf. Consequently, the trial court could not have properly found that Melton, by reason of being secretary of Defendant, was vested with power to sign Exhibit 3 for Defendant.

■ Another possible theory for upholding the award on Count I is that Melton had *apparent* authority to sign Exhibit 3 on Defendant's behalf. Citing *Buffalo Trust Co. v. Producers' Exchange No. 148,* 224 Mo.App. 199, 23 S.W.2d 644 (1930), Plaintiffs maintain Melton possessed such authority.

In *Buffalo Trust,* the crucial issue was whether a corporation's manager was authorized to sign trade acceptances for the corporation. The court said, *inter alia:* "A corporate entity cannot clothe its manager with apparent authority and as to third persons object to the exercise of that authority." *Id.* at 649[8]. However, *Buffalo Trust* is of little help to Plaintiffs in the instant case, as *Buffalo Trust* held: "[T]here was substantial evidence that the manager . . . acted not only within the apparent scope of his authority, but within

the limits of his actual authority[.]" *Id.* at [9]. As explained earlier in this court's opinion, the evidence does not support a finding that Melton had actual authority to sign Exhibit 3 on Defendant's behalf.

The concept of apparent authority is set forth in *Link v. Kroenke,* 909 S.W.2d 740 (Mo.App. W.D.1995):

"Apparent authority is authority which a *principal,* by its acts or representations, has led third persons to believe has been conferred upon an agent; such authority does not arise if the third person does not act in belief that the agent possesses authority to act on the principal's behalf. Apparent authority differs from actual authority in that the principal communicates directly to the third person to establish apparent authority while to create actual authority, the principal communicates with the agent. . . .

To establish the apparent authority of a purported agent, [a party] must show that (1) the principal manifested his consent to the exercise of such authority or knowingly permitted the agent to assume the exercise of such authority; (2) the person relying on this exercise of authority knew of the facts and, acting in good faith, had reason to believe, and actually believed, the agent possessed such authority; and (3) the person relying on the appearance of authority changed his position and will be injured or suffer loss if the transaction executed by the agent does not bind the principal."

*Id.* at 745 (emphasis in original; citations omitted).

In the instant case there was no evidence that Defendant, acting through its officers (Dwane and Lois), ever represented to Cliff or Leda that Melton was autho-

---

authority—but not apparent authority. As explained in *Mark Century Corp. v. Tiger Broadcasting Co.,* 509 S.W.2d 737, 739 (Mo.App. 1974):

"[I]mplied authority is actual authority which the principal intended the agent to have which lacks direct proof, but which is

implied or inferred from relevant facts and circumstances as reasonably necessary to accomplish the purpose or purposes of the expressly conferred authority. . . . If no actual authority exists, no authority can be implied." (Citations omitted.)

rized to sign promissory notes for Defendant, or that Melton, with the knowledge of Dwane or Lois, ever represented to Cliff or Leda that she (Melton) possessed such authority.

More importantly, however, Cliff issued the $30,000 check November 27, 1995. The uncontradicted evidence was that Melton signed Exhibit 3 sometime later. Thus, Plaintiffs did not change their position in reliance on a belief that Melton was authorized to sign Exhibit 3 for Defendant. By the time Plaintiffs received Exhibit 3, Plaintiffs had already parted with the $30,000.

Accordingly, this court holds the trial court could not have properly found for Plaintiffs on Count I on the theory that Melton possessed apparent authority to sign Exhibit 3 for Defendant.

■ As an alternative basis for recovery on Count I, Plaintiffs argue that even if the $30,000 loan was "without actual or apparent authority of [Defendant]," Defendant is nonetheless liable to repay the loan "because the money was deposited in the corporation's account and used as operating capital to pay corporate debts." In support of that hypothesis, Plaintiffs cite *Linwood State Bank v. Lientz*, 413 S.W.2d 248 (Mo.1967). There, the court cited with approval the following passage from *Farmers & Merchants Bank v. Burns & Hood Motor Co.*, 295 S.W.2d 199, 202 (Mo. App.1956):

> "Although the instant note was concededly executed by the president of defendant company, in the absence of express authority from the board of directors, and therefore contrary to the provisions of the applicable by-law, we must nevertheless hold that the note constitutes a binding obligation. This follows because the law is well settled that where, as here, a corporation with knowledge of the act has ratified it, or has accepted the consideration of the note, it will be as much bound as if the note had been originally executed in ex-

act conformity with the provisions of its by-laws."

*Linwood State Bank*, 413 S.W.2d at 253.

The above-quoted passage does not help Plaintiffs because there was no evidence in the instant case that Defendant's board of directors ever ratified the loan or knowingly accepted the proceeds.

■ Ratification must be accomplished in the same manner that would be required to order an action beforehand. *Kaufman v. Henry*, 520 S.W.2d 152, 155[6] (Mo.App.1975). Earlier in this opinion, this court held Dwane lacked authority to obtain loans for Defendant without approval of Defendant's directors. Accordingly, Lois's approval was necessary in order to ratify the $30,000 loan and Exhibit 3.

Dwane solemnly admitted Lois did not know about the $30,000 loan or the $5,000 loan. That is consistent with Lois's testimony that she first learned of the loans "the night before the divorce," months after the loans were made. There was no evidence that after acquiring that knowledge, Lois, as a director of Defendant, engaged in any conduct manifesting ratification of the loans. Plaintiffs' ratification theory thus fails for lack of proof.

In sum, although this court must view the evidence favorably to Plaintiffs, this court nonetheless concludes the evidence does not support a finding for them on Count I under any theory. This court therefore holds the trial court erred as a matter of law in entering judgment for Plaintiffs on Count I.

Defendant's second point avers the trial court erred in ruling for Plaintiffs on Count II in that there was no substantial evidence to support a finding that Dwane was authorized to borrow the $5,000 on behalf of Defendant. Obviously, no issue about Melton's authority is involved in Count II, as only Dwane and Cliff were involved in that transaction. As recounted earlier, no note was given for the $5,000.

What this court said earlier about Dwane's lack of authority to borrow funds on Defendant's behalf without board ap-

proval applies with equal force to Defendant's second point. Inasmuch as Dwane and Lois had always borrowed money together from Plaintiffs for Defendant's corporate purposes, there was no evidence to support a finding that Dwane had apparent authority to act alone in borrowing the $5,000 for Defendant, and there was no evidence that either Dwane or Lois ever told Cliff that Dwane had such authority.

This court therefore holds the evidence does not support a finding for Plaintiffs on Count II under any theory, hence the trial court erred as a matter of law in entering judgment for Plaintiffs on Count II.

The judgment is reversed.

PREWITT P.J., and PARRISH, J., concur.

Appeal # 22375-1

PLAINTIFF'S EXHIBIT
3
ALL-STATE® INTERNATIONAL

Date  November 30, 1995

Gaar's Inc. hereby unconditionally promises to pay by this promissory note to the order of M.C. & Leda Fay Gaar located at 138 Gaar Rd Walnut Shade, Mo. 65771. The principal sum of Thirty Thousand Dollars. $30,000. at the rate of 10% per annum on the unpaid principal balance hereof from time to time outstanding. The interest only shall be paid in monthly installments of $250.00 per month, the first of which shall be in the sum of Two Hundred Fifty Dollars. $250.00 and shall be due on January 10, 1996.

Maker  Dwane C. Gaar

By Tommie Melton

Title  Secretary