**Beverly WEATHERWAX, Appellant,**

v.

**Glenn REDDING, et ux.,
et al., Respondents.**

**No. 21432.**

Missouri Court of Appeals,
Southern District,
Division One.

Oct. 3, 1997.

---

2. Section 375.296 uses similar language and refers to Section 375.420.

Robert M. Sweere, Springfield, for appellant.

Glenn Redding and Betty Redding, pro se.

1. Other parties were added after the action began; however, the dispute in this appeal is between only Beverly Weatherwax and the Reddings. Consequently, no mention of the other parties or the trial court's resolution of the issues regarding them is necessary in this opinion. For convenience, we henceforth refer to Beverly Weatherwax as Plaintiff, and to the Reddings as Defendants.

2. As explained more fully *infra*, Plaintiff's petition comprised five counts. The part of the judgment adjudicating Count I awards Plaintiff $5,835. The part of the judgment adjudicating Count V awards Plaintiff $2,000. The part of the judgment adjudicating Defendants' counterclaim awards Defendants $11,299.11. Immediately following the latter award, the judgment states:

CROW, Judge.

Beverly Weatherwax, owner of a house and lot, sued Glenn Redding and Betty Redding, the occupants of that property.[1] Plaintiff's petition prayed for possession of the property and other relief, including money damages.

Defendants counterclaimed, seeking compensation from Plaintiff for improvements to the property allegedly made by Defendants. Defendants based their counterclaim on § 524.160, RSMo 1994, which reads:

"If a judgment or decree of dispossession shall be given in an action for the recovery of possession of premises, or in any real action in favor of a person having a better title thereto, against a person in the possession, held by himself or by his tenant, of any lands, tenements or hereditaments, such person may recover, in a court of competent jurisdiction, compensation for all improvements made by him in good faith on such lands, tenements or hereditaments, prior to his having had notice of such adverse title."

The trial court heard the case without a jury and entered judgment awarding Plaintiff sundry relief including possession of the property and money damages from Defendants. The judgment also awarded Defendants money damages from Plaintiff on Defendants' counterclaim. The sum awarded Defendants exceeded the sum awarded Plaintiff. The judgment set off the two sums against each other and provided that Defendants shall recover the difference, $3,449.11, from Plaintiff.[2]

"The court orders the monetary judgments in favor of Plaintiff in Counts I ($5,850) and V ($2,000) set-off against the judgment in favor of Defendants Redding on their counter-claim ($11,299.11) for a total monetary judgment in favor of Defendants Redding of $3,449.11."
An alert reader will note a $15 discrepancy in the judgment. As reported in the second sentence of this footnote, the part of the judgment adjudicating Count I awards Plaintiff $5,835; however, the segment of the judgment quoted above states the amount awarded Plaintiff on Count I is $5,850. The trial court obviously used the latter figure in calculating that the difference between the total damages awarded Plaintiff and the damages awarded Defendants is $3,449.11. In this appeal, no issue is raised about the discrepancy, hence we leave the judgment as we find it.

Plaintiff appeals. Her sole point relied on challenges only the portion of the judgment awarding Defendants damages on their counterclaim.

We begin our account of the pertinent facts by setting forth those which are undisputed. We shall refer to the property involved in this litigation as Lot 14.[3]

By warranty deed executed April 4, 1986, and recorded April 9, 1986, a grantor conveyed Lot 14 to Plaintiff and her then-husband, Ralph Weatherwax. Plaintiff and Defendants agree that the deed vested ownership of Lot 14 in Plaintiff and Ralph[4] as tenants by the entirety.

At trial, Plaintiff was asked whether she had ever been to Lot 14. She answered: "I think that's the house Ralph showed me before he bought it. He took me to it [in 1986]."

Defendants, as "Purchasers," signed a contract dated May 30, 1986, to buy Lot 14. The contract—received in evidence at trial—identifies Plaintiff and Ralph as "Vendors," and bears the signature of Ralph and a signature purporting to be that of Plaintiff.

The contract sets the price at $46,500, and requires Defendants to pay monthly installments of $450, beginning May 30, 1986, and continuing until all principal and interest is paid.

Defendants took possession of Lot 14 on June 1, 1986. Thereafter, they made improvements to it. The trial court found Ralph had knowledge of the improvements and consented thereto, and that the improvements enhanced the market value of Lot 14 by $11,299.11.[5] Neither side challenges those findings in this appeal.

Plaintiff testified Ralph was in the "rental business." She explained that prior to 1993 she had no "dealings" regarding properties titled "jointly" to her and him. Ralph "put people in [the properties]," and collected rent.

Circumstances changed in January, 1993. According to Plaintiff, Ralph was charged with conspiracy to commit murder.[6] He was free on bond pending trial, but was required to "stay at home." As a result, Plaintiff became "somewhat involved in the management of [the] rental properties."

Plaintiff recounted that in the fall of 1993 she did not get a payment from the occupants of Lot 14. She asked her lawyer to investigate. As a result of the inquiry, she received a copy of the contract of May 30, 1986, together with a copy of an unrecorded warranty deed, ostensibly executed by her and Ralph on June 3, 1986, conveying Lot 14 to Defendants.[7]

Plaintiff avowed that upon examining the two documents, she concluded the signatures purporting to be hers were not written by her.

At Plaintiff's direction, her lawyer notified Defendants by letter that Plaintiff was not bound by the contract or the deed, and that if Defendants wanted to buy Lot 14, they would have to enter into a new contract with Plaintiff.

Negotiations between Plaintiff and Defendants, through counsel, did not resolve the matter. Plaintiff commenced this suit February 18, 1994.

By a decree of dissolution of marriage entered May 2, 1994 (while this suit was pending in the trial court), Plaintiff's marriage to Ralph was dissolved. The decree awarded Plaintiff all right, title and interest in Lot 14.

As noted earlier,[8] Plaintiff sought relief in five counts. The trial court granted Plaintiff relief including possession of Lot 14, money

---

3. Its legal description is: "All of Lot Fourteen (14) in WHITE OAK, a Subdivision in the City of Springfield, Greene County, Missouri."

4. For convenience, we henceforth refer to Mr. Weatherwax as Ralph. We mean no disrespect.

5. That is the amount awarded Defendants on their counterclaim. Footnote 2, *supra.*

6. Nothing in the record suggests the alleged conspiracy had any connection with the dispute in this case.

7. The contract provided that a deed to Lot 14 would be held in escrow, to be delivered to Defendants when the purchase price was paid.

8. Footnote 2, *supra.*

damages, and a declaration that Plaintiff is vested with fee simple ownership of Lot 14. Inasmuch as Defendants did not appeal and Plaintiff attacks only the portion of the judgment awarding Defendants damages on their counterclaim, we need not comment on the relief awarded Plaintiff.

In *First Federal Savings & Loan Assn. v. Wills*, 789 S.W.2d 873 (Mo.App. S.D.1990), the owners of real estate which was subject to a deed of trust made improvements on their tracts. *Id.* at 874. The mortgagee subsequently foreclosed the deed of trust. *Id.* The owners asserted a claim for improvements per § 524.160, the statute relied on by Defendants in the instant case (quoted *supra* ). This court held:

> "The statute embodies the common law remedy to the extent it is based upon the acquiescence of the holder of the adverse title. *Toalson v. Madison,* [307 S.W.2d 32 (Mo.App.1957) ]. The constitutionality of the statute has been upheld on that basis. *Tice v. Fleming,* 173 Mo. 49, 72 S.W. 689 (1903). One making improvements may not recover at common law or under the statute *unless the holder of the adverse title has knowledge of the improvements.*"

*First Federal,* 789 S.W.2d at 875[3] (emphasis added).

At trial, Plaintiff's lawyer endeavored to demonstrate that Plaintiff was unaware Defendants were making improvements to Lot 14, and that Plaintiff learned of the improvements only after Defendants were evicted.[9] Cross-examination of Defendant Glenn Redding by Plaintiff's lawyer produced this dialogue:

> "Q. Did you notify Mrs. Weatherwax in advance of the making of any of these improvements?
>
> A. Not directly.
>
> Q. ... Are you aware of any evidence which establishes that she was aware of the making of these improvements in advance of their being made?
>
> A. Only statements from Mr. Weatherwax.
>
> Q. I see. Beyond that, anything?
>
> A. No, sir.

> Q. So if she were to testify that she had no advance knowledge of the making of any of these alleged improvements, it's fair to say you can't dispute that with any witness here today?
>
> A. No, sir, I couldn't. I only have Mr. Weatherwax's word for it."

Ralph was not present at trial, and no testimony from him was presented by deposition.

Plaintiff was questioned by her lawyer about the improvements. The testimony included this:

> "Q. Did you ever hear from anyone prior to the time any of those improvements were made that they were being planned or that [the Reddings] were going to make them?
>
> A. No."

The portion of the judgment awarding Defendants $11,299.11 on their counterclaim reads, *inter alia:*

> "The Court ... finds that at the time the improvements were made Ralph Weatherwax was a true owner of the property or a tenant by the entirety with Plaintiff herein and that Ralph Weatherwax was fully aware of the improvements and consented thereto. The Court also finds that said improvements were made without the knowledge of his co-tenant by the entirety Beverly Weatherwax. The Court however, imputes the knowledge of Ralph Weatherwax regarding said improvements to his wife."

Plaintiff's sole point relied on reads:

> "The trial court erred in entering judgment in favor of Defendants and against Plaintiff on Defendants' counterclaim for improvements because the trial court misapplied the law regarding entireties real estate by imputing the knowledge and/or consent of Plaintiff's then husband to the making of said improvements on entireties real estate to Plaintiff/wife in that the act, knowledge or consent of the husband alone cannot bind the wife or otherwise adverse-

---

9. Defendants were evicted December 5, 1994.

ly affect the interest of a wife in and to entireties real estate."

We begin our deliberation on Plaintiff's claim of error by recognizing that the trial court found Plaintiff did not know Defendants were making improvements to Lot 14. There was competent and substantial evidence to support that finding, and it is not against the weight of the evidence; consequently, we defer to the trial court on that finding. *State ex inf. Fuchs v. Foote,* 903 S.W.2d 535, 539[14] (Mo. banc 1995). That means the outcome of this appeal hinges on whether the trial court correctly applied the law in imputing Ralph's knowledge of, and acquiescence in, the improvements to Plaintiff.

■ Plaintiff cites a multitude of cases applying the well entrenched principle that the act of one entireties tenant alone cannot create an adverse interest in entireties property. Defendants do not challenge that proposition as an abstract statement of law. However, that rule of law does not bar recovery on Defendants' counterclaim.

In *Ethridge v. Perryman,* 363 S.W.2d 696 (Mo.1963), a husband's knowledge was attributed to his wife in a real estate transaction involving entireties property. There, the husband negotiated with a lender for a loan, to be secured by a deed of trust on property owned by the husband and his wife. *Id.* at 698. The wife did not participate in the negotiations; however, she signed the note and deed of trust. *Id.* Later, it was discovered that because of a scrivener's error, the deed of trust did not cover all of the intended property. *Id.* at 699. The lender sued to reform the deed of trust; the trial court granted reformation. *Id.* at 697–98.

■ On appeal by the husband and wife, one of the issues was whether the wife was chargeable with the husband's knowledge that the deed of trust was to cover all of the property. *Id.* at 701. The Supreme Court held:

"The agency of a husband for his wife may be shown by direct evidence or by facts and circumstances which will authorize a reasonable and logical inference that he was empowered to act for her. . . . The

parties were husband and wife. A wife by her actions and conduct may be estopped to deny her husband's authority to act as her agent for her in her behalf. It is apparent that [the wife] entrusted the entire transaction to her husband . . . ; that he acted and negotiated not only for himself but for both himself and wife with reference to the property held by them by the entireties. When the deal was made he arranged for the parties to meet . . . to close the deal, and [the wife] appeared for that purpose. It is a fair inference that she was apprised by her husband of the transaction and the nature and purpose of the meeting. When she arrived and was asked to sign the papers she did not repudiate the contract her husband had made. Instead, she ratified and approved his acts and dealings leading to the execution of the papers, and by signing the note and deed of trust signified her consent to and acquiescence in the transaction he had arranged. There is nothing to indicate that she did not benefit from the loan. In these circumstances she is estopped to deny his authority to act as her agent in her behalf, and she is chargeable with her husband's knowledge and understanding of the true contract; her husband's mistake is her mistake and she is bound thereby and must assume full responsibility therefor."

*Id.* at 701–02 (citations omitted).

In the instant case, Plaintiff knew in 1986 that Ralph was going to buy Lot 14. As we have seen, she testified he showed it to her before he bought it, and she also testified he was in the "rental business."

■ By our count, the decree dissolving Plaintiff's marriage to Ralph lists 47 parcels of real estate owned by them as tenants by the entirety. Plaintiff's testimony at trial (21 months after the dissolution) included this:

"Q. Now in addition to [Lot 14], you have twenty-eight other rental properties in Springfield?

A. Yes.

Q. And those become vacant at times?

A. Yes.

Q. And you re-let them?

A. Yes.

Q. And obtain rent for them?

A. Yes."

Inasmuch as Plaintiff and Ralph never resided in the house on Lot 14 after it was purchased in 1986, the trial court could have reasonably inferred Plaintiff assumed Ralph intended to either rent Lot 14 or sell it at a profit. Plaintiff could not have reasonably believed Ralph would buy Lot 14 and let it sit unoccupied for several years.

The trial court could also have reasonably concluded that Ralph had Plaintiff's authority to select renters, set the rent, and oversee the rental property. Indeed, Plaintiff's reply brief concedes: "[T]he trial record supports the proposition that Ralph Weatherwax's essential authority was to act as [Plaintiff's] agent solely with respect to renting their joint rental properties. . . ." Plaintiff's awareness that the properties were generating rent is confirmed by this excerpt from her testimony:

"Q. On occasion, would people come to your home and leave rent checks?

A. Yes."

Nonetheless, argues Plaintiff, the trial court erred in charging her with Ralph's knowledge about the improvements Defendants made to Lot 14. Plaintiff maintains the record shows Ralph was not authorized by her to handle all her business affairs. Plaintiff reminds us that the trial court implicitly found Ralph was not authorized by Plaintiff to sign her name to the contract with Defendants, as demonstrated by the trial court's judgment quieting title to Lot 14 in Plaintiff. Plaintiff emphasizes that she testified: "I think the reason he started signing my name to things is because I was saying, 'No, I'm not going to buy these things. I'm not going to sign any more.'" According to Plaintiff, she said that to Ralph "in the mid eighties."

Assuming, arguendo, that Ralph was not authorized by Plaintiff to buy or sell entireties property without her consent, it does not necessarily follow that the knowledge he acquired in managing their property was not imputable to her. Obviously, someone had to oversee the property. In the arrangement between Plaintiff and Ralph, the overseer was Ralph from 1986 until 1993. That Ralph monitored Defendants' occupancy of Lot 14 is evidenced by the testimony of Glenn Redding. Glenn recounted several instances where he and Ralph discussed improvements to Lot 14.

Because Plaintiff professed ignorance of the purported contract to sell Lot 14 to Defendants, we hold the trial court could have reasonably found Plaintiff believed the occupants of Lot 14 were renters. We have already held the trial court could have reasonably found Ralph had Plaintiff's authority to oversee the rental property. Based on that holding, we find the trial court could have reasonably imputed to Plaintiff the knowledge acquired by Ralph in performing his duty as overseer, including Ralph's knowledge of the improvements to Lot 14 made by Defendants.

We do not ignore Plaintiff's argument that the trial court made no explicit finding that Ralph acted as Plaintiff's agent in dealing with Defendants regarding the improvements. As explained below, the lack of such a finding does not impair the award on Defendants' counterclaim.

■ Because this was a judge-tried case, all fact issues upon which no specific findings were made by the trial court shall be considered as having been found in accordance with the result reached, and the judgment will be upheld on any reasonable theory supported by the evidence. Rule 73.01(a)(3); *Nail Boutique, Inc. v. Church*, 758 S.W.2d 206, 207–08[3] (Mo.App. S.D.1988); *O'Bar v. Nickels*, 698 S.W.2d 950, 955[1] (Mo.App. S.D.1985).

■ Inasmuch as the evidence amply supported a finding that Ralph was Plaintiff's agent in renting the entireties property and monitoring the occupants, we decide this appeal as if the trial court had made such a finding. Notice to an agent, within the scope of the agent's authority, is notice to the principal, and the agent's knowledge is binding on the principal. *Hendricks v. Behee*, 786 S.W.2d 610, 612[8] (Mo.App. S.D.1990). It is thus evident the trial court did not misapply the law in imputing to Plaintiff Ralph's knowledge of, and consent to, the

improvements to Lot 14 made by Defendants.

Plaintiff's point relied on is denied, and the judgment is affirmed.

GARRISON, P.J., and PREWITT, J., concur.