Cheryl **BARNETT**, Petitioner–Appellant,

v.

Roy **ROGERS**, Jr., Respondent–Respondent.

No. SD 31958.

Missouri Court of Appeals, Southern District, Division Two.

May 20, 2013.

---

Lee E. Poppen, Springfield, MO, for appellant.

Thomas J. Hamilton II, Overland Park, KS, for respondent.

DON E. BURRELL, J.

Cheryl Barnett ("Petitioner") sought to remove her brother, Roy Rogers, Jr., ("Trustee"), as trustee of the Roy Rogers and Dale Evans Rogers Trust ("the Trust") and obtain awards of compensatory and punitive damages for Trustee's alleged breach of his fiduciary duties to the Trust. After a bench trial, the trial court denied relief.[1]

In a single point relied on, Petitioner—a beneficiary of the Trust—claims

> [t]he trial court erred when it failed to remove [Trustee] as trustee of [the Trust] and allow the Trust recovery for the losses it sustained because of a breach of [Trustee]'s fiduciary duties in that [Trustee] failed to administer the trust in good faith in the interests of the beneficiaries, he failed to administer the Trust as a prudent person, he failed to take reasonable steps to enforce the

---

**1.** The judgment denied relief on all claims asserted by Petitioner. The trial court also denied Trustee's "request for an order requir-ing Petitioner to reimburse the [Trust] for all of the attorneys' fees expended in defense of [Trustee,]" a ruling Trustee has not appealed.

claims of the trust, he failed to keep adequate records, and he failed to keep the beneficiaries reasonably informed.

Because the trial court was not obligated to believe Petitioner's evidence in support of her claim that Trustee breached his fiduciary duties, we affirm.

### Applicable Principles of Review and Governing Law

In reviewing the judgment in a court-tried case, we follow the principles set forth in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976): we will "affirm the trial court's judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law." *In re Estate of Blair*, 317 S.W.3d 84, 86 (Mo.App. S.D.2010). "The trial court's judgment is presumed correct, and [the appellant has] the burden of proving it erroneous." *Strobl v. Lane*, 250 S.W.3d 843, 844 (Mo.App. S.D.2008).

We review questions of law *de novo*, *Blair*, 317 S.W.3d at 86, but "[w]e defer to the trial court's determination of witness credibility and recognize that the court is free to accept or reject all, part or none of the testimony presented." *Id.* "We [also] accept as true the evidence and inferences favorable to the prevailing party and disregard all contrary evidence." *Watermann v. Eleanor E. Fitzpatrick Revocable Living Trust*, 369 S.W.3d 69, 75 (Mo.App. E.D.2012). When a judgment is entered in favor of a party without the burden of proof, it "need not be supported by any evidence." *Warren v. Thompson*, 862 S.W.2d 513, 514 (Mo.App. W.D.1993). Finally, in "a judge-tried case, all fact issues

upon which no specific findings were made by the trial court shall be considered as having been found in accordance with the result reached, and the judgment will be upheld on any reasonable theory supported by the evidence." *Weatherwax v. Redding*, 953 S.W.2d 162, 167 (Mo.App. S.D.1997).

### Facts and Procedural Background

In 1967, television star Roy Rogers opened a museum ("the Museum") in California to display a collection of his western artifacts and memorabilia ("the collection"). In 1981, Roy Rogers and his wife, Dale Evans Rogers, established (and later amended) the Trust for the benefit of their family, naming themselves and Trustee as the initial trustees.[2] The collection was placed into the Trust, and the Trust owned other property, including music and film rights. Roy Rogers passed away in 1998. Before her death in 2001, Dale Evans Rogers decided that some particular assets, including two preserved horses (Trigger and Buttermilk), a preserved dog (Bullet), and two saddles, would be gifted by the Trust to the Museum. After his mother's death in February 2001, Trustee remained as the Trust's sole trustee. Trustee was also an equal beneficiary of the Trust, along with Petitioner, and their other five siblings ("the beneficiaries"). The Trust permitted the payment of a reasonable fee to Trustee for serving in that role, but Trustee never received such a fee.

The Museum was organized as a not-for-profit corporation at least as early as 1994. Tax documents admitted into evidence as Petitioner's Exhibits N, O, and Z reflected that the purpose of the Museum included

---

**2.** A copy of the Trust and an amendment to it ("Trust documents") were admitted into evidence as Petitioner's Exhibits A and B, but these exhibits were not included with other exhibits deposited with this court. Thus, we presume that the Trust documents were favorable to the judgment and unfavorable to Petitioner's point. *See In re Carl McDonald Revocable Trust Dated Oct. 1, 1979*, 942 S.W.2d 926, 932 (Mo.App. S.D.1997).

the "provision of education on the western United States, and the work and life of cowboys." Trustee served as the Museum's president both before and after the death of his parents.

From June 2000, the Museum was to provide a source of revenue to the Trust under an amended license agreement ("the license") that permitted the Museum to display the collection in exchange for a $7,000 monthly payment to the Trust. The amended license agreement was signed by both Trustee and his mother in their capacity as trustees. They also signed the same agreement on behalf of the Museum, with Trustee acting as President and Dale Evans Rogers as Vice President. The Museum operated a gift shop, and a royalty was paid to the Trust for items sold in the gift shop that bore the names of Roy Rogers and Dale Evans Rogers. Additionally, certain items from the collection were consigned to the gift shop for sale, and "[a] portion of the sale" was paid to the Trust.

In 2003, the Museum was moved to Branson from California after its attendance began to drop. To install the Museum in the new location, the Trust extended a line of credit to the Museum ("the line of credit") that permitted the Museum to make withdrawals of up to $600,000 during 2003. The line of credit was secured by a promissory note and a $450,000 security interest in the preserved animals and saddles. The Museum used approximately $425,000 of the $600,000 line of credit to make the move. The Museum was to make monthly payments on the principal, with interest, such that the outstanding balance would be retired within 120 months. During that time, the Museum's board of directors consisted of the six beneficiaries and seven other individuals.

When the Museum moved to Branson, Trustee moved with it, and Petitioner resigned from the board.

Trustee paid $2,000 per month from the Trust to each beneficiary, an amount that approximated each beneficiary's pro-rata share of the Museum's payments for the license and line of credit.[3] Trustee thought that making the monthly $2,000 payment to the beneficiaries "was pretty much [his] call[,]" but he tried to keep it going. In addition, Trustee paid the beneficiaries "one-sixth of whatever the [T]rust brought in, profit-wise, that particular quarter[.]"

For a time, the Museum "[d]id very well" in Branson. But by 2006, gas prices were going up, and attendance began decreasing. Based on Trustee's discussions with other business people in the Branson area, he believed that the downturn was cyclical. As a result, he did not worry about the declining attendance at first, and none of the Museum's board members expressed an opinion that the Museum should be closed. Trustee and the Museum's staff looked for additional ways to market the Museum, and Trustee's band played some venues for free in order to hand "out the brochures of the [M]useum." At the Museum's 2006 board meeting, Trustee advised the board that if "conditions continued[, then] the [M]useum would stop making payments [to the beneficiaries]." It was reported at the September 2007 annual board meeting that attendance numbers were still down.

The Museum was located in leased space, and while the rent could vary depending on things like "[c]ommon area maintenance charges[,]" it ran between

---

**3.** Petitioner agreed during cross-examination that a beneficiary's monthly share from the

total amount of these things would have been less than $2,000.

$30,000 and $33,000 per month.[4] The lease was secured by an interest in the Museum's preserved animals and saddles. Trustee sublet part of the Museum's space to his company, "Golden Stallion[,]" for $5,542 per month. Trustee used the sublet space for his band's performances, and he prepaid the rent to the Museum on a yearly basis. The Museum was still obligated on its building lease when it reached the point of being unable to meet all of its obligations, and Trustee felt that he had "to keep the building open to try to hold everything together." Trustee had "always understood that when you don't come up with the money [for rent], that they can lock the premises down. And then if it's not remedied, they can . . . dispose of whatever's in the [M]useum or in the building." Based on that understanding, Trustee elected to pay the Museum's rent and other expenses instead of paying its obligations to the Trust. According to Trustee, the building lease provided that "[i]n case of tenant default . . . landlord shall have the right to reenter the premises . . . and take possession . . . and to remove all . . . personal property by direct or summary action . . . and without being liable for the damages therefore or in connection therewith."[5]

The Museum stopped making the license payment to the Trust in November 2007. In 2008, the operation of the building went "down to the bare bones"; staff was cut "basically in half," and family members who worked as employees assumed additional responsibilities such as "tak[ing] care of the toilets and things like that[.]" Trustee was paid a salary that year from the Museum of $62,754, and his son, Dustin Rogers ("Dustin"), who worked as the general manager of the Museum, was paid a salary of approximately $59,000 per year. At that point, the Trust was still making the $2,000 per month payment to the beneficiaries and "the [T]rust had other assets and other incomes that came in[.]" Quarterly financial statements were going out to the beneficiaries which indicated that the license payments were not being made by the Museum to the Trust.

By July 2008, the Museum stopped making payments on royalty and consignment sales. In August 2008, the Trust stopped making payments on the line of credit. The amount still owing, as of the prior month, was $216,667. At the Museum's 2008 board meeting, the board members were informed in person that the Museum was not making its payments to the Trust.

The Museum continued to miss payments to the Trust, and Trustee executed four promissory notes in the amount of payments missed between November 2007 and May 2009 on royalty and consignment sales, the license, and the line of credit. The notes did not provide for interest. During this time, Trustee believed "if we had to close the [M]useum down, that the [M]useum had assets in addition to the collection, that we could—in addition to Trigger, Bullet, Buttermilk and their saddles, that would have more than been enough to retire the debt . . . at auction." Before 2009, the sales of Trustee's parent's memorabilia had "always" exceeded the auction house estimates. He also believed that it was important to protect the collection displayed in the Museum from seizure by a creditor because these assets were used by the Museum to generate income to

---

4. Although the lease was admitted into evidence at trial as Petitioner's Exhibit EE, Petitioner did not deposit that exhibit with this court. As a result, we presume its contents would not be favorable to Petitioner's claims on appeal. *See Carl McDonald Revocable Trust,* 942 S.W.2d at 932.

5. The transcript indicates that Trustee was purportedly reading aloud from the lease.

the Trust, and the collection could also be sold at some point in time for the benefit of the Trust.

In January 2009, "the [T]rust had not had enough money" come in to cover the $2,000 monthly payment that Trustee had been sending to the beneficiaries, so he sent a check to each beneficiary that equaled what would have been that beneficiary's share of the payment on the line of credit had it been made. The check Petitioner received was accompanied by a hand-written letter from Trustee which stated that "for the first time in almost six years, the Museum did not have enough visitors in December to cover the [license for] the collection." At trial, Trustee explained that he used "the wrong choice of words" in the letter because he should have stated that the Trust did not have enough money to pay an amount equal to both the license and line of credit payments. The letter also indicated that Trustee would be sending a "note to explain all of this[.]" The Trust then sent "the letters explaining what and how."

Trustee also made a series of loans from the Trust to the Museum between January 31, 2009 and May 2009 that were documented with two promissory notes. The notes did not provide for interest. In May 2009, Trustee initiated discussions with the Museum's landlord in an attempt to adjust the Museum's rent. Five days after that meeting, the landlord filed a "UCC–1" statement listing as security interests the same items described in the building lease. Trustee also received notice that the landlord was not interested in adjusting the Museum's rent and was instead expecting the Museum to honor its remaining four years on the lease. Additional missed pay-

ments by the Museum and other loans made by the Trust after May 2009 through December 2009 were documented by checks, hand-written notes, and spreadsheets. Trustee and his wife, individually and through their company, also loaned approximately $299,000 to the Museum.

Petitioner filed her lawsuit in August 2009. By September 2009, the value of the Museum's assets was estimated to be $640,000, and its debt exceeded this figure. The Museum closed three months later.

Petitioner's Exhibit BB, "Trustee's Claim to [the M]useum at liquidation," prepared in connection with the winding up of the Museum's corporation and including copies of promissory notes, checks, handwritten notes, and spreadsheets, was admitted into evidence and showed a total of $590,080.70 owed by the Museum to the Trust. Dustin testified that when the Museum closed, it owed the Trust: $182,000 for license payments; $152,200 for loans made to the Museum in 2009; $7,156 for royalties; $32,058 for consignment sales; and $216,667 on the line of credit.

In February 2010, the Trust, landlord, bank, and the Museum reached a settlement agreement of "all accounts[.]" [6] By the time of trial in January 2011, the Museum had liquidated all assets that could "realize any monies" and had netted $758,073. Dustin testified that some of the proceeds went to other creditors, but $243,951.10 was paid to the Trust—an amount that represented 41.34% of the total amount owed. Of the loans the Trust made to the Museum in 2009, the Trust received $62,922 from the auction proceeds—41.34% of the $152,199.52 owed (a loss per beneficiary of $14,879.59). In contrast, Trustee's family and company re-

---

6. Although a copy of the settlement agreement was admitted into evidence as Petitioner's Exhibit GG, the exhibit was not deposited with this court. Dustin testified that he was able to negotiate with the landlord to reduce the amount owed on its lease with a two-tiered payback of 1/2 in up-front cash and a pro rata share of the liquidated assets.

covered a total of $84,665.55 of the approximately $299,000 they had loaned the Museum (just over 28%).

Byron Whetstone, who had experience in managing business liquidations, testified as an expert witness for Trustee. Based upon the information he was provided, the revenues for the Museum fell from 2006 to 2007 by "not a tremendous percentage, it was just . . . indicative of the external environment that the [M]useum was operating within." He would not have recommended shutting down the Museum at that point. When "revenues did not materialize through the summer" of 2008, Mr. Whetstone "would have [been] concerned . . . [about] the landlord, because the landlord had a security interest in some of the assets of the [M]useum, [and] he also had a peripheral interest in . . . [the] collection of items that were in the [M]useum[.]" Mr. Whetstone understood that the landlord might not have had legal authority to "lock the door" of the Museum, but "[he had] seen it done[,]" and he stated, "When there's a crisis, everybody's trying to do whatever they can do to get paid." He testified that the "bottom line is, landlords can be extremely difficult if they have things that belong to you to get from them if they're owed dough." He also stated:

> And since the [T]rust had an interest in assets that were physically located within the landlord's property, it would seem to me that the [T]rust should use whatever resources it could, within reason, to make sure that it doesn't lose all the value that it was securing. And to me, that's the essence of the whole transaction.

Mr. Whetstone testified that it was prudent for Trustee, even in his position as a trustee, to pay his salary from the Museum. Mr. Whetstone opined that it was reasonable for Trustee "to loan money from the [T]rust to the [M]useum in order to pay the [M]useum's operating expenses in early 2009" and that without those loans the Museum would have been forced into a receivership or bankruptcy that would have "negatively damaged" the Trust's ability to recover the maximum amount of value "[f]or the collection[.]" He reasoned:

> If it were me, I would have known that there was a link between the [T]rust and the [M]useum, and I would have done anything I could to protect the assets of the [T]rust and as well as the [M]useum from secured creditors trying to come in and force a liquidation of those assets without an orderly opportunity to do so.

Mr. Whetstone agreed that while the Trust could have removed the collection from the building in order to protect it from creditors, he thought there would have been "extensive costs" involved in moving the collection from the Museum. He also pointed out that instead of acting to enforce the license, he would have put the past-due amounts "on a promissory note with favorable terms, . . . informed the other shareholders in the [T]rust of the actions and the reason for the loss or the reasons for the nonpayment, and proceeded." Based upon Mr. Whetstone's understanding, that is exactly what Trustee did.

Mr. Whetstone testified that if the collection had been pulled from the Museum in a way that forced the Museum's bankruptcy, the Trust would not "have come close to 41 cents on the dollar" in payment of its debt (the result the Museum achieved by liquidating outside of bankruptcy). He further testified that a payback to the Trust of "41 cents on the dollar" "was a fair result." Mr. Whetstone testified that it was "[a]bsolutely" in the Trust's best interest for the Museum to not file bankruptcy "[b]ecause the value of the [T]rust assets would be impacted by

the negativity that was associated with the bankruptcy filing[.]"

Mr. Whetstone testified that based upon the information provided to him, Trustee did not act imprudently in the years 2007 to 2009. He also testified that the decision in 2009 to close the Museum was timely made. Petitioner stipulated that Trustee's liquidation of the Museum's assets was done in a timely fashion after the decision to close the Museum was made.

Mary Rogers Patterson, a beneficiary and member of the Museum's board of directors, did not think Trustee needed to get permission before he made the loans from the Trust, and after learning of the loans, she approved of them. Ms. Patterson testified that she thought Trustee was acting in the best interests of both the Trust and the Museum in making the loans. She received statements regarding the Trust from its accountant, and she received "notations with the checks or things like that" from Trustee. She also received information about the Museum at its annual meetings, and she could receive other information about the Museum at any time she asked. Ms. Patterson stated that Trustee was "hands down" the best person to be the trustee for the Trust, and she would "[a]bsolutely not" replace him as trustee. She testified that the Trust and the Museum were about "more than just dollars and cents for all of us[,]" and she then described the goal of preserving the image of her parents in the work they did for others. Ms. Patterson testified that Trustee had been true to "the purposes that [her parents] stood for[.]"

Petitioner testified that everyone except herself voted to move the Museum from California to Branson, but she did vote in favor of the line of credit. When the decision was made to move the Museum to Branson, she resigned from its board. Petitioner said she had no complaint about Trustee's actions when he was co-trustee with their parents or with the decision to move the Museum to Branson. She testified that the only fraudulent activity Trustee engaged in was: (1) his notation on checks to her from the Trust that the amount included payment on the license when license payments had not been made; and (2) his January 2009 letter indicating that for the first time the license payment was not being made. She admitted, however, that she already "knew that they were missing their payments" at the time Trustee sent his January 2009 letter.

Petitioner testified that she saw from the quarterly statement she received in May 2008 that some payments had been missed, and she then looked back "at the statement from 2007" and saw that several months had been missed. She did "some addition [her]self just taking the statements," and she knew that the Museum was behind on its license and line of credit payments. Petitioner received the $2,000 payments from the Trust corresponding to license and line of credit payments up until January 2009, even during some months when her statements showed that the Museum had not made such payments to the Trust, and she cashed those checks. Petitioner's position at trial was that the Museum should have been closed earlier.

Petitioner agreed with Trustee's counsel's quotation of a provision in the Trust describing as follows Trustee's duty to the Trust:

> When investing, reinvesting, purchasing, acquiring, exchanging, selling, and managing property, the trustee shall act with care, skill, prudence, and diligence under circumstances then prevailing, specifically including, but not way [sic] by limitation, the general economic conditions and the anticipated needs of the trust and its beneficiaries, that a prudent person acting in a like capacity and

familiar with such matters would use in the conduct of an enterprise of a like character and with aims to—with like aims to attain the goals of the grantors as determined from this instrument.

Petitioner also agreed that Trustee was not required to consult the beneficiaries before making decisions to invest, sell, or manage property, and he was not required to consult her before making loans. She further agreed that Trustee did not have to provide trust accounting "less frequently than annually" and that Trustee met this requirement. She received quarterly statements regarding the Trust from the Trust's accountant. Petitioner acknowledged that the Trust required a written objection to any accounting, and she admitted that she had not made any such written objection to Trustee. She admitted that she had never called Trustee to ask why a license payment was not shown on the accounting. Petitioner agreed that the Trust permitted Trustee to receive a fee for performing his duties to the Trust, but she was not aware that he had ever taken such a fee.

The record does not indicate that any party made a written request to the trial court prior to the presentation of evidence that it issue written findings of fact and conclusions of law. On December 21, 2011, the trial court sent a letter to all counsel indicating that it was finding the "issues in favor of [Trustee] on all [Petitioner's] claims and [would be] order[ing] no relief of any kind to either party with respect to

attorneys fees or cross or counter claims." The letter requested that counsel for Trustee prepare a formal judgment. On March 7, 2012, the trial court issued its judgment denying all of Petitioner's claims, Trustee's claim for reimbursement of attorney fees, and all other claims by "any party to this litigation that have not been specifically ruled upon[.]" The judgment also incorporated "all factual findings and legal conclusions articulated in the [trial c]ourt's December 21, 2011, letter[.]" This appeal timely followed the entry of the judgment.

## Analysis

■■■ Petitioner's point on appeal violates Rule 84.04(d)(1)(A) [7] by asserting two claims of trial court error in a single point relied on.[8] The point challenges both the trial court's refusal to remove Trustee as the trustee of the Trust and its decision to deny "recovery for the losses [that the Trust] sustained[.]" "Improper points relied on, including multifarious points, preserve nothing for appellate review." *Hines v. Smith*, 172 S.W.3d 437, 439 n. 4 (Mo.App. S.D.2005) (even though the contentions in a point related to an overall claim that a contract was not breached, the point was still deficient because it challenged multiple rulings of the trial court). However, we may review a multifarious point *ex gratia*, and we choose to do so here. *See Klinkerfuss v. Cronin*, 289 S.W.3d 607, 613 (Mo.App. E.D.2009) (where the court chose to review a trust beneficiary's claim that "join[ed] multiple,

---

**7.** All rule references are to Missouri Court Rules (2012).

**8.** Petitioner's point reads, verbatim:

THE TRIAL COURT ERRED WHEN IT FAILED TO REMOVE [Trustee] AS TRUSTEE OF [the Trust] AND ALLOW THE TRUST RECOVERY FOR THE LOSSES IT SUSTAINED BECAUSE OF A BREACH OF [Trustee]'s FIDUCIARY DUTIES IN THAT HE FAILED TO ADMINISTER THE

TRUST IN GOOD FAITH IN THE INTERESTS OF THE BENEFICIARIES, HE FAILED TO ADMINISTER THE TRUST AS A PRUDENT PERSON, HE FAILED TO TAKE REASONABLE STEPS TO ENFORCE THE CLAIMS OF THE TRUST, HE FAILED TO KEEP ADEQUATE RECORDS, AND HE FAILED TO KEEP THE BENEFICIARIES REASONABLY INFORMED.

unrelated contentions" in a single point relied on). More importantly, the point is also defective because its error allegations challenge the ultimate results of the case instead of a particular ruling of the trial court.

> The [statement of] error contemplated by Rule 84.04(d) in a court-tried case is not the judgment itself but the trial court's actions or rulings on which the adverse judgment is based, such as explicitly or implicitly making or failing to make a certain factual finding, applying or failing to apply a particular rule of law, taking or failing to take a certain procedural action, etc.

*Wheeler v. McDonnell Douglas Corp.*, 999 S.W.2d 279, 283 n. 2 (Mo.App. E.D.1999). Further, Petitioner's complaints about Trustee as stated in the point are also generic; they provide no context for the claims based on the facts of the case as required by Rule 84.04(d)(1)(C). *Cf. Crawford Cnty. Concerned Citizens v. Missouri Dep't of Nat. Res.*, 51 S.W.3d 904, 909 (Mo.App. W.D.2001) (although point challenged ruling and gave legal reason, it was still deficient because it was "nothing more than an abstract statement of the law" and failed to explain the claim in the context of the case).

After first correctly stating the applicable standard of review based on Rule 84.13(d) and *Murphy*, 536 S.W.2d at 32, Petitioner then fails to state whether she claims the judgment is not supported by substantial evidence, is against the weight of the evidence, or misstates or misapplies the law. Instead, Petitioner goes directly to an argument that "[t]he trial court abused its discretion when it failed to re-move [Trustee] as [t]rustee and when it failed to enter judgment against him to reimburse the Trust for the damages caused by his improper actions." [9] Petitioner next cites particular provisions of the Missouri Uniform Trust Code ("MUTC") that require a trustee to: administer a trust "as a prudent person" exercising "reasonable care, skill, and caution[,]" enforce claims of the trust, and keep beneficiaries "reasonably informed about the administration of the trust and of the material facts necessary for them to protect their interests." Sections 456.8–804, 456.8–811, and 456.8–813.[10]

"The [MUTC] generally applies to all trusts created before, on, or after January 1, 2005, and to all judicial proceedings concerning trusts commenced on or after that date." *In re Stephen M. Gunther Revocable Living Trust*, 350 S.W.3d 44, 45 (Mo.App. E.D.2011). However, the MUTC is supplemented by "[t]he common law of trusts and principles of equity" "except to the extent modified by sections 456.1–101 to 456.11–1106 or another statute of this state[,]" section 456.1–106, and "[t]he terms of a trust prevail over any provision of [the MUTC] except [in certain statutorily-defined circumstances not relevant to this case]." Section 456.1–105.2, *et seq.*

▮ The terms of a trust are very important because they may permit broad discretion or a more specific standard to be assessed by "the bounds of reasonable judgment." *Betty G. Weldon Revocable Trust ex rel. Vivion v. Weldon ex rel. Weldon*, 231 S.W.3d 158, 174–75 (Mo.App. W.D.2007). Here, even though the Trust documents were admitted into evidence,

---

**9.** As earlier noted, those alleged improper actions were Trustee's failure to: (1) administer the Trust in the interest of the beneficiaries; (2) act as a prudent person; (3) enforce the claims of the Trust; (4) "keep adequate rec-ords"; and (5) "keep the beneficiaries reasonably informed."

**10.** All statutory references are to RSMo Cum. Supp.2011.

Petitioner has failed to include them in the record on appeal. "Where ... exhibits are not made part of the record on appeal, such evidentiary omissions will be taken as favorable to the trial court's ruling and unfavorable to the appellant." *Carl McDonald Revocable Trust*, 942 S.W.2d at 932. With that presumption working against Petitioner and in favor of the trial court's ruling, it would be extremely difficult for us to find that the trial court abused its discretion.

Petitioner correctly asserts that if a trustee fails his duties, "the court may ... remove the Trustee[,]" section 456.7–706.2(1), and "the court may" impose remedies as listed in section 456.10–1001.2, including compelling the trustee to pay money or restore property. But she cites no authority for the proposition that the use of "may" in these sections indicates anything other than a grant of discretion to the trial court. Therefore, as best we understand Petitioner's position on appeal, it is that the trial court abused its discretionary power to remove Trustee and award damages based on the evidence adduced at trial, not that the trial court erred as a matter of law in applying provisions of the Trust or the MUTC.

*Which Party Bore the Burden of Proof?*

■ In general, "[t]he presumption is that a trustee has acted in good faith and the burden is on the one questioning his actions and seeking to establish a breach of trust to prove the contrary." *Jarvis v. Boatmen's Nat'l Bank of St. Louis*, 478 S.W.2d 266, 273 (Mo.1972). In contrast, "[w]here a trustee has an individual interest in a transaction involving a trust asset, a trustee bears the burden of proving that his actions were proper and all doubts are resolved against him." *Deutsch v. Wolff*, 994 S.W.2d 561, 569 (Mo. banc 1999). Here, Trustee's individual interest in

transactions outside of any beneficiary interest he had in the Trust went to his transactions with the Museum, not the Trust. Trustee made loans to the Museum from his family and his company; he was paid a salary by the Museum; and his company sublet space in the Museum. Yet, even to the extent that these transactions could be seen as having benefited, at least indirectly, from the relationship between the Trust and the Museum, or that Trustee had an "individual interest" in the transactions at issue as contemplated in *Deutsch* because he was also a beneficiary of the Trust, as discussed, *infra*, Trustee presented evidence supporting the propriety of his actions that the trial court was entitled to credit.

■ "The power of the court to remove a trustee should be used sparingly, and before it is exercised, there should be such misconduct as to evidence of want of capacity or fidelity, which has, or might likely, put the trust in jeopardy." *Guirl v. Guirl*, 708 S.W.2d 239, 244 (Mo.App. E.D. 1986).

Generally, where a grantor vests sole discretion of a matter in a trustee, a court will not interfere in the exercise of that discretion unless the trustee willfully abuses his discretion or acts arbitrarily, fraudulently, dishonestly, or with an improper motive. *In re Heisserer*, 797 S.W.2d 864, 870 (Mo.App. S.D.1990). If the trust, however, supplies a standard by which to evaluate the reasonableness of the trustee's conduct, a court will interfere with the trustee's exercise of a power when he acts beyond the bounds of reasonable judgment. *Id.*

*Betty G. Weldon Revocable Trust*, 231 S.W.3d at 174–75.

■ "If the trustee breaches his trust, the beneficiary is entitled to recover (a) loss in value of the trust property attributable to the breach, (b) profit inuring to the

trustee from the breach, or (c) loss of profit to the trust which would otherwise have accrued but for the breach." *Parker v. Pine*, 617 S.W.2d 536, 540 (Mo.App. W.D.1981) (emphasis added). Section 456.10–1003.2 provides that "[a]bsent a breach of trust, a trustee is not liable to a beneficiary for a loss or depreciation in the value of trust property or for not having made a profit."

From the evidence that Petitioner *has* included in the record on appeal, we know that this is not a case where a trustee decided to invest trust assets in an entity of the trustee's own choosing. The Trust and the Museum, and the relationship between the two, were established by Trustee's parents as settlors of the Trust. Petitioner's father created the Museum. Petitioner's mother gifted property from the Trust to the Museum, and she was also a trustee of the Trust and an officer of the Museum at the time the $7,000 license payment was established. *Cf. Matter of Heisserer*, 797 S.W.2d 864, 873–74 (Mo.App. S.D.1990) (to the extent that there was a conflict of interest in trustee's position as a tenant on trust property and the trustee, "th[e] conflict was created and authorized by the trust instrument"). One of the primary purposes of the Museum was to educate others and, as Ms. Patterson testified, to carry on the legacy of Roy Rogers and Dale Evans Rogers.

In addition, to the extent that we may glean some of the provisions of the Trust documents from Petitioner's cross-examination testimony at trial, she conceded that Trustee's standard of prudence included a recognition of "circumstances then prevailing, specifically including, but not way [sic] by limitation, the general economic conditions and the anticipated needs of the trust and its beneficiaries," as well as "the goals of the grantors[.]" Petitioner also agreed that Trustee did not have to consult the beneficiaries before making decisions about investments, selling property, managing property, or making loans. Petitioner acknowledged that Trustee met his annual accounting requirement, that she received quarterly statements from the accountant for the Trust, that she never objected to any accounting as required under the Trust before filing the lawsuit, that she cashed the checks she received from the Trust even after the Museum stopped making its regular payments to the Trust, and that in response to the information she received, she never asked Trustee for additional information about the license payments. Petitioner does not assert that it was improper for Trustee to serve in his designated capacities either the Trust or the Museum.

In addition to receiving accounting information, Petitioner also testified that she was not deceived by Trustee.[11] Petitioner contends instead that Trustee should have closed the Museum sooner. But the testimony of Mr. Whetstone, which the trial court was entitled to credit, was that Trustee's decision to close the Museum was timely made. He further testified that the loans from the Trust to the Museum were reasonable, as was the use of the Trust's assets to protect the collection from possible, albeit perhaps unauthorized, interference by the landlord. He further testified that it was "[a]bsolutely" in the Trust's best interest for the Museum to avoid bankruptcy as such an event would have negatively impacted the money that could be raised by a sale of the memorabilia that was a significant asset of the Trust. Fi-

---

**11.** The trial court was also entitled to believe that Trustee had no intent to defraud Petitioner when he sent her his hand-written letter based on Trustee's testimony that he simply used "the wrong choice of words[.]"

nally, he opined that the percentage of the Trust's recovery of its claim was a fair result and that Trustee did not act imprudently in the years 2007–2009.

Petitioner offers *Deutsch,* 994 S.W.2d at 569–70, and *Morrison v. Asher,* 361 S.W.2d 844, 851 (Mo.App. Spfld.D.1962), as examples of cases in which trustees failed to fulfill their duties of loyalty to a trust and its beneficiaries. In doing so, Petitioner overlooks our obligation to defer to the trial court as the finder of fact in the instant case, *see Blair,* 317 S.W.3d at 86, and our obligation to view all of the evidence in the light most favorable to the result and disregard all contrary evidence.[12] *See Watermann,* 369 S.W.3d at 75. Here, the trial court found that "given the reality of the circumstances and the conditions existing at the time[, the] management and operating decisions were made by [Trustee] in the manner most favorable to the Trust and he was not in breach of his fiduciary duties in any of the actions that he took." [13]

That finding is dispositive of Petitioner's appeal. Because the trial court found that Petitioner failed to prove her claim that Trustee had breached his fiduciary duties to the Trust, it properly refused both Petitioner's request to remove him as Trustee and her request to recover her portion of the losses sustained by the Trust. *See Warren,* 862 S.W.2d at 514, *Parker,* 617 S.W.2d at 540, and section 456.10–1003.2. Petitioner's point is denied, and the judgment is affirmed.

JEFFREY W. BATES and MARY W. SHEFFIELD, JJ., concur.

---

**12.** Petitioner made the same mistake in the statement of facts in her brief because, as Trustee points out, it included evidence contrary to the judgment and omitted evidence supporting the judgment. For instance, the statement of facts makes no mention of the favorable testimony of Ms. Patterson and Mr. Whetstone.

**13.** The trial court also noted that a "loss of approximately $15,000 was minimal in light of all the potential losses that could have occurred without the actions of [Trustee] on behalf of all concerned." Petitioner argues in her reply brief that this statement "shows the [trial] court's failure to comprehend the evidence presented[,]" but we need not decide whether this was a reference to the pro-rata share of each beneficiary's loss on the loans made to the Trust in 2009 or some other loss. The trial court also stated that the losses incurred by the Trust resulted not from Trustee "act[ing] in any improper manner with respect to his duties as [t]rustee, but rather due to the reality of trying to keep a sinking business afloat [that] was literally rearranging the 'deck chairs' in the best manner possible and absolutely preserved the assets to the greatest extent possible." We must uphold the judgment "on any reasonable theory supported by the evidence." *Weatherwax,* 953 S.W.2d at 167.